**JOHNSON INTERNATIONAL COMPANY, a Washington corporation, Plaintiff,**

v.

**JACKSON NATIONAL LIFE INSUR-ANCE COMPANY, a Michigan corporation, Defendant.**

**No. CV 88–897.**

United States District Court, D. Nebraska.

Jan. 27, 1993.

Daniel Duffy and Leif Erickson, Cassem, Tierney, Adams, Gotch & Douglas, Omaha, NE, for plaintiff.

David Woodke and Susan Norris, Gross & Welch, Omaha, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Pending before me are various posttrial motions. The motions which I now resolve are: (1) defendant's motion and renewed motions for judgment as a matter of law (Filings 103, 104, and 131); (2) defendant's motion for new trial (Filing 132); (3) plaintiff's motions for attorney fees (Filings 130 and 145); and (4) defendant's renewal of motion for award of expenses on failure to admit and request for sanctions (Filing 158).

This is a diversity case. The parties stipulated that the substantive law of the State of Washington applied. The jury returned a verdict for plaintiff and against defendant in the principal sum of $250,000. (Filing 123.) The court then entered judgment for that amount, plus interest. (Filings 127 and 128.)

### I. Motions for Judgment As a Matter of Law

The motions for judgment as a matter of law were made at the appropriate times, taken under advisement, (Filing 105), and renewed within ten days of the entry of judgment.[1] With one exception, the motions merit no discussion and will be denied. As to the so-called negligence theory of recovery, I conclude that the motions must be granted as this theory of recovery was barred by the applicable statute of limitations.

---

**1.** A 1991 amendment to the Federal Rule of Civil Procedure changes terminology. Under Rule 50, both a motion for directed verdict and a motion for judgment notwithstanding the ver- dict are now designated as motions for judgment as a matter of law. 9 C. Wright *et al., Federal Practice and Procedure* § 2521, at 165 (1992 Pocket Part).

## A.

This case began[2] as a contract action by plaintiff (hereinafter Johnson), owner of an insurance policy on the life of its "key man" Howard Warford (hereinafter Warford), against defendant (hereinafter Jackson–Life), an insurance company. The claim was that Jackson–Life failed to pay Johnson when Warford died on August 13, 1986, and thus breached the contract of insurance issued on November 21, 1985. Jackson–Life defended, claiming that Warford had made false statements concerning his health on the application taken by Jackson–Life agent Bill Yaeger (hereinafter Yaeger) on or about September 20, 1985. Johnson responded by arguing, among other things, that Yaeger knew of Warford's health problems because Yaeger had taken a previous insurance application regarding Warford on or about April 10, 1985, in connection with an insurance policy later issued by Summit National Life Insurance Company (hereinafter Summit) on or about June 5, 1985. This was the posture of the case on the morning of trial.

Johnson moved to amend the complaint and the pretrial conference order, (Filing 92), on the morning of trial.[3] Johnson wanted to add a theory of recovery predicated upon negligence. In essence, Johnson claimed that Jackson–Life, through its agent Yaeger, was negligent when it failed to advise Johnson of certain risks arising out of the "replacement" of the Summit policy by the Jackson–Life policy.[4]

The reason given for the late motion to amend was that the Court of Appeals for the State of Washington had decided some eight days earlier that there was a cause of action for negligence under state law when there was a violation of the so-called replacement insurance policy regulations[5] of the State of Washington. *See Strother v. Capitol Bankers Life Ins.*, 68 Wash.App. 224, 842 P.2d 504, 510–512 (1992).

I concluded that amendment of the pretrial conference order under Fed.R.Civ.P. 16(e) was necessary to prevent manifest injustice. I also concluded that amendment of the complaint under Fed.R.Civ.P. 15(a)[6] was in the interests of justice. In order to cure any prejudice the defendant might suffer, I offered to continue trial of the case. I also offered to consider ordering the plaintiff to pay the defendant for non-refundable airline tickets which had been purchased for certain trial witnesses.

Counsel for the defendant stated he did not desire a continuance and wished to proceed to trial that day, provided that: (1) he could use the deposition of a designated Summit employee; (2) the plaintiff would be precluded from offering additional witnesses with respect to the new theory; (3) defendant would be precluded from offering expert testimony on the question of whether the Jackson–Life policy was a replacement policy; and (4) the court would consider amending the pretrial conference order should it be necessary in order for the defendant to fairly present its defense. Plaintiff's counsel agreed to these provisions, and I so ordered.

Defendant filed its answer, (Filing 99), to the amended complaint the next day. In its answer, defendant specifically alleged that the applicable statute of limitations had expired. (Filing 99, ¶ 20.) The case proceeded to trial. Based partly upon the fact that the applicable statute of limitations had run on the negligence theory, the defendant moved for judgment as a matter of law at the appropriate times. I took those motions under advisement. Using a special

2. The complaint was filed on December 14, 1988, (Filing 1), and service was obtained on December 19, 1988 (Filing 2).

3. Trial commenced September 8, 1992.

4. Both the Summit policy and the Jackson–Life policy were for $250,000. Warford died during the contestability period of both policies. There was evidence that Warford had not been totally forthcoming about his health in the Summit application as well.

5. These regulations essentially required that Johnson be given a written warning notice, in a form provided by the regulations, not later than at the time of the taking of an application for insurance which would replace existing life insurance. Wash.Admin.Code §§ 284–23–400, *et seq.* (September 1, 1990).

6. I made no finding, and was not asked to make a finding, as to whether the amendment would "relate back" under Rule 15(c).

verdict form, the jury[7] returned a verdict for plaintiff on both theories of recovery.[8]

### B.

■ I am satisfied that the statute of limitations[9] relevant to the negligence theory of recovery had expired by the time plaintiff sought to amend on September 8, 1992, unless the amendment "related back" to the original complaint filed on December 14, 1988.

Plaintiff relies upon Federal Rule of Civil Procedure 15(c)(2) which allows "relation-back" where "the claim ... asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." As leading text writers have stated, the addition of new theories of recovery will not defeat the "relation-back" doctrine of Rule 15 if the factual basis upon which the action depends remains the same in the new pleading as compared with the old pleading:

> The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading.
>
> ... Indeed, an amendment that states an entirely new claim for relief will relate back as long as it satisfies the test [same

conduct, transaction, or occurrence] embodied in ... Rule 15(c).

6A C. Wright *et al., Federal Practice and Procedure* § 1497, at 94–99 (1990) (footnotes omitted).

The question thus becomes whether defendant, "viewed as a reasonably prudent person, ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." *Id.* at 93 (footnote omitted). Viewing the defendant as reasonably prudent, I conclude that Jackson–Life could not have reasonably anticipated it might have liability for negligent failure to give the replacement policy warning when it was served with the plaintiff's 1988 complaint and when it thereafter engaged in discovery respecting that complaint.

At issue when this case began, and during its discovery phase, was plaintiff's claim that defendant was contractually obligated to pay on the Jackson–Life insurance policy. Thus, "the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading" regarded Johnson's rights under the Jackson–Life contract of insurance. On the other hand, the amendment on the day of trial asserted an entirely different factual claim, which was that Jackson–Life was negligent for failing to give a written

---

**7.** This case was tried to a seven-person jury. The parties stipulated that after six hours the agreement of six jurors would constitute the jury's verdict.

**8.** The parties agreed that recovery would be $250,000 under either theory of recovery because the face amount of the Jackson–Life policy was $250,000 and the face amount of the Summit policy was also $250,000. If the jury found that Jackson–Life breached its contract of insurance, it would owe the policy amount on the contract claim involving the Jackson–Life policy. Furthermore, if the jury found Jackson–Life was negligent in failing to give the replacement policy notice, since the jury also had to find as part of its negligence determination that the Summit policy would have been in existence and Summit would have paid its policy amount, Johnson was entitled to $250,000 under this theory. It should be noted that the

jury first returned a verdict on the first theory of recovery (the contract claim), but did not complete the verdict form as to the second theory of recovery (the negligence claim). (Court's Exhibit 3.) The jury was then instructed to render a verdict on the second theory of recovery, (Filing 122), and they returned a verdict for plaintiff on the second theory of recovery (Filing 123).

**9.** The parties agree that suit had to be commenced within three years of Warford's death. *Compare* Plaintiff's Brief in Support of Relation Back of Plaintiff's Negligence Cause of Action at 1 *with* Defendant's Brief in Support of Judgment as a Matter of Law on the Issue of Relation Back of Newly Filed Negligence Count at 2. I agree. *See* Wash.Rev.Code § 4.16.080(2) (1992). This meant suit had to be commenced by August 13, 1989, and suit was filed in this case prior to that date.

warning regarding the alleged replacement of the Summit policy.

At the heart of the first claim was the factual question of whether or not Jackson–Life had reason not to pay the contract of insurance because Warford intended to and did deceive Jackson–Life (or that Jackson–Life would not have issued the policy had it known the truth).[10] Although Warford's conduct was not irrelevant to the negligence theory, the primary issue of the negligence claim was the propriety of Yaeger's conduct in failing to give Johnson a replacement warning without regard to Warford's conduct.[11]

I find that the factual thrust of the two theories of recovery [12] is so different that a reasonably prudent person would not have perceived exposure on the negligence theory of recovery when served with the complaint on the contract theory of recovery. *See, e.g., Morgan Distrib. Co. v. Unidynamic Corp.,* 868 F.2d 992, 994–95 (8th Cir.1989) (new complaint did not state simply a new theory of recovery, but an altogether different wrongful act; thus, "relation-back" principles would not apply); *Fuller v. Marx,* 724 F.2d 717, 720–21 (8th Cir.1984) (a different theory of recovery for the same wrongful act did not relate back because opposing party did not have notice).

An argument can be made that Jackson–Life, having been offered a continuance to engage in discovery and electing to go to trial instead, has given up any realistic claim that it was "prejudiced" by the amendment. I think this argument proves too much. As the Court of Appeals stated in the context of a discussion of prejudice, "the rule does not contemplate depriving defendants of the protection of the statute of limitations." *Fuller,* 724 F.2d at 720 (citations omitted). One of the principal purposes of the statute of limitations is to allow a party to make a timely investigation of the facts so as to avoid the "effects of the passage of time, which include faulty memories and missing witnesses...." *Id.* at 721. It is often impossible to prove what the passage of time has cost a party in terms of the ability to mount a defense. As counsel for the defendant explained when stating why he did not think a continuance would remedy the situation, "It's a matter of passage of time. This involves events in 1985 and 1986." (Transcript of Conference with Counsel at Start of Trial at 5:11–12). Under the circumstances, I do not believe counsel's election to proceed to trial without taking advantage of a continuance can fairly be taken as evidence that the defendant was not prejudiced by the amendment.

Judgment as a matter of law will be granted in favor of the defendant and against the plaintiff, and the plaintiff shall take nothing on the negligence theory of recovery (second theory of recovery) for the reason that the statute of limitations bars recovery.

## II. Motion for New Trial

With two exceptions, the motion for new trial merits no discussion, and it will be denied. I shall now address those exceptions.

### A.

Jackson–Life argues that the last-minute amendment which permitted the negligence theory of recovery to be asserted confused the jury to the prejudice of Jackson–Life. Inasmuch as I shall grant the motion for judgment as a matter of law regarding the negligence theory of recovery, I think it appropriate to address Jackson–Life's concerns.

Jackson–Life objects to the jury instructions in this case because, in its view, the instructions improperly permitted the jury

10. Instruction No. 7 (Filing 119).

11. Instruction No. 8 (Filing 119).

12. It may be incorrect to use the phrase "theory of recovery" rather than "cause of action." The contract action was measured for damage purposes by reference to the face amount of the Jackson–Life policy, while the negligence theory of recovery was measured for damage purposes by reference to the face amount of the Summit policy. As noted in the text, however, since the proper interpretation of Rule 15 does not turn on such technical distinctions, it is unnecessary to pursue the issue further.

to consider negligence concepts relative to the contract claim. Jackson–Life believes the jury was confused as a consequence.

I have carefully considered the entirety of the jury instructions (Filing 119). I believe they accurately state the law and appropriately differentiate between the first and second theories of recovery where necessary.

■ More specifically, Jackson–Life complains that instructions 11 and 12 were particularly confusing because they were not limited to the negligence theory of recovery. I do not believe the instructions should have been limited; therefore, I find no prejudice to Jackson–Life.

Instructions 11 and 12 concern the relationship between a principal and an agent, including those circumstances when the knowledge of an agent is extended to his or her principal. I believe these instructions were correct statements of the law, and they were certainly applicable to the contract theory of recovery.

For example, there was an issue in relation to the contract theory of recovery concerning the extent to which the knowledge Yaeger acquired by virtue of his prior dealings with Warford was attributable to Jackson–Life. Indeed, instruction 7 required the jury to determine whether or not Jackson–Life knew the truth about Warford and whether Jackson–Life reasonably relied upon the representations of fact made by Warford. (Filing 119, Instruction 7, ¶¶ 5 & 6.) It was necessary to instruct the jury regarding the contract theory of recovery on the issue of when, and under what circumstances, the knowledge of an agent is attributable to a principal. Thus, I conclude that instructions 11 and 12 need not have been limited to the negligence theory of recovery.

Some concluding observations are appropriate regarding Jackson–Life's claim that the jury was confused by the submission of the negligence theory of recovery with the contract theory of recovery. My concluding observations are as follows.

■ The jury returned a special verdict form which differentiated between the neg-

ligence theory of recovery and the contract theory of recovery. Moreover, the jury was generally instructed as to each separate theory of recovery. The jury first returned a verdict on the contract theory of recovery without returning a verdict on the negligence theory of recovery. (Court's Exhibit 3.) Only after they were instructed to return to their deliberations did the jury return a verdict on the negligence theory of recovery as well. Since (a) the instructions generally differentiated between the two theories, (b) the verdict form differentiated between the two theories, and (c) I know the jury separately considered the two theories, it seems evident that the jury was not confused.

I also note that the burden of proving an affirmative defense as to the contract theory of recovery rested with Jackson–Life and that the contract of insurance was admitted by Jackson–Life. This meant, and the jury was so instructed, that unless Jackson–Life met its burden of proof by "clear, cogent and convincing evidence," the jury's verdict must be for Johnson. As a consequence, it is not surprising that the jury returned a verdict in favor of Johnson on the contract theory of recovery. This in turn suggests that any technical error would have been harmless.

## B.

As one of its reasons for a new trial, Jackson–Life alleges that a member of the jury, Mrs. Taiko Y. Saragosa, was not competent to sit as a juror in this case because she did not understand the English language and because she improperly used extraneous prejudicial information in the form of a dictionary or translation book to interpret the court's instructions.

## 1.

■ In support of this claim, Jackson–Life submitted the affidavit of Margaret M. Simet. (Filing 134). Ms. Simet was the lone dissenting voice on the jury, and she stated in her affidavit that Mrs. Saragosa, "a person of Japanese descent, brought with her and used a dictionary for use in interpreting the language in the court's

jury instructions during the jury's deliberations." (Filing 134.)

Ms. Susan E. Norris, one of the attorneys for Jackson–Life, also submitted an affidavit. (Filing 133). Ms. Norris's affidavit recounted a conversation she had with Mrs. Saragosa and, in pertinent part, stated that: (a) Mrs. Saragosa indicated she used a dictionary for translation of words in the court's jury instructions, including such words as "negligence" and "proximate cause"; (b) Mrs. Saragosa indicated she did not understand language contained in the court's instructions; and (c) Mrs. Saragosa indicated she had problems with translation of the answers "yes" and "no." (Filing 133.)[13]

As is my practice, I permitted all counsel of record to *voir dire* all prospective jurors. None of them questioned Mrs. Saragosa. I recall the jury selection in this case, and Mrs. Saragosa in particular, because Mrs. Saragosa, small of stature and of obvious Oriental heritage, stopped and bowed slightly as she entered the courtroom.

I asked each of the prospective jurors to introduce themselves by giving general background information orally, in open court, in response to a written questionnaire furnished each prospective juror prior to the jury selection process. Mrs. Saragosa answered the questions in a responsive fashion, although her speech was somewhat stilted:

My name is Taiko Saragosa. I live at 7906 Greene Circle, Omaha, Nebraska. I have one son, 26 years old, and my husband works at Creighton University. He teach English at international program, and I am housewife. I be working about three months at the telephone, bookkeep-

er, teaching Japanese, but I'm not working now.

Transcript of *Voir Dire* at 16:15–20.

No lawyer asked Mrs. Saragosa any questions, although they were permitted to do so after she had orally introduced herself in open court.

### 2.

When confronted with the motion for new trial, Johnson requested a hearing to determine, pursuant to Federal Rule of Evidence 606(b), whether or not "extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Jackson–Life joined in this request.

As a result, I interviewed Mrs. Saragosa in my chambers in the presence of counsel and other court personnel.[14] The pertinent colloquy between Mrs. Saragosa and myself is reproduced verbatim:

THE COURT: All right. Let me go in first, and you all can follow me and take your seats as I have indicated.

(The following proceedings occurred in chambers.)

THE COURT: Well, first of all, Mrs. Saragosa, thank you for coming.

TAIKO SARAGOSA: You're welcome. I sorry. Something I make cause a problem?

THE COURT: No. I don't think you caused a problem, and I'm certainly not upset with you. We are here in my chambers, and I think we ought to let you know who is all here just so you have an understanding, and then I will discuss with you a little bit about why we are here.

Now, you will remember that the lawyers for the parties in this case, Johnson International Company and Jackson Na-

---

**13.** Johnson is critical of counsel for interviewing the juror without supervision by the court and without advising adverse counsel first. There are serious problems associated with counsel interviewing a juror. *See* 3 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 606[06] (1992). Suffice it to say, however, that I do not believe the matter is worthy of further discussion, particularly because I believe that counsel acted in complete good faith.

**14.** I did not allow counsel to ask questions, but I did allow them to suggest questions they would like me to pose to Mrs. Saragosa. The purpose of restricting the inquiry was to be certain that Mrs. Saragosa's mental processes during the jury's deliberations were not improperly probed. *See* 3 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶¶ 606[05] & 606[06].

tional Life Insurance Company are here, and I'll have them reintroduce themselves to you, and we will begin with counsel for the plaintiff, Mr. Duffy.

MR. DUFFY: Mrs. Saragosa, I'm Dan Duffy, and this is Leif Erickson, my associate.

THE COURT: And Mr. Woodke, counsel?

MR. WOODKE: Hi, Mrs. Saragosa. Susan Norris.

THE COURT: Now, Mrs. Saragosa, in here as well with me are one of my present law clerks Leanne Kullenberg and another law clerk to Judge Cambridge who used to work for me as well, Mary Buckley, and then my court reporter, Mr. Francis, who is taking down our words.

Now, as you recall, you served as a juror in a case involving Johnson International Company and Jackson National Life Insurance Company. What I want to do is ask you a few questions about your jury service. I will be asking you the questions. I won't let the lawyers ask you questions. Just you and I will be talking. The lawyers may suggest some questions for me to ask. Now, because we have to be obviously concerned with legal things, I'm going to ask you to take an oath to promise to tell me the truth, and Mr. Francis will administer that to you. You can just remain seated. If you would raise your right hand, I will administer an oath to you. Will you raise your right hand, please?

(Taiko Saragosa was placed under oath.)

TAIKO SARAGOSA: Yes, I do.

THE COURT: All right. Thank you, ma'am. Mrs. Saragosa, how long have you lived in the United States?

TAIKO SARAGOSA: Since the 1966.

THE COURT: And when did you become a United States citizen?

TAIKO SARAGOSA: I'm not sure, but 1972 or 1973. I came to this building.

THE COURT: Yes.

TAIKO SARAGOSA: I think. I don't remember exactly when.

THE COURT: And you took a citizenship test at that time, did you not?

TAIKO SARAGOSA: Yes, I did.

THE COURT: And did you have to know how to read and write the English language at that time?

TAIKO SARAGOSA: Maybe 50%.

THE COURT: Maybe 50%, and you took an English language test at that time, didn't you?

TAIKO SARAGOSA: Yes. I went to base. They teach us how to get the examination for the citizenship.

THE COURT: You went to the base to do that?

TAIKO SARAGOSA: Take test. I mean I went to school there and come to here.

THE COURT: When were you born, Mrs. Saragosa? Pardon me for asking.

TAIKO SARAGOSA: 1934.

THE COURT: 1934?

TAIKO SARAGOSA: February 26.

THE COURT: February what? I'm sorry?

TAIKO SARAGOSA: 26.

THE COURT: Where were you born in?

TAIKO SARAGOSA: In Japan.

THE COURT: Now, you're married, if I understand correctly?

TAIKO SARAGOSA: Yes, 1965.

THE COURT: 1965?

TAIKO SARAGOSA: In Japan.

THE COURT: In Japan, and your husband, I think you told us when we originally talked with you when we were selecting a jury, your husband teaches at Creighton University, is that right?

TAIKO SARAGOSA: Yes.

THE COURT: Tell us what he does there.

TAIKO SARAGOSA: Mostly he teach international student English as second language.

THE COURT: Okay. He teaches English as a second language to international students?

TAIKO SARAGOSA: Yes.

THE COURT: Where was your husband born?

TAIKO SARAGOSA: He was born in California.

THE COURT: In California?

TAIKO SARAGOSA: 1937.

THE COURT: All right. Does he speak Japanese?

TAIKO SARAGOSA: A little bit.

THE COURT: A little bit. Okay. When you're at home, what do you speak mostly to your husband?

TAIKO SARAGOSA: Sometimes Japanese–English.

THE COURT: Sometimes Japanese–English?

TAIKO SARAGOSA: Yes.

THE COURT: And you have a son who is 26, I think you told us?

TAIKO SARAGOSA: Yes.

THE COURT: Where does your son live?

TAIKO SARAGOSA: He is in Berkeley.

THE COURT: In Berkeley, California?

TAIKO SARAGOSA: Yes.

THE COURT: What does he do there?

TAIKO SARAGOSA: He just finish master degree, Berkeley. He want to get into the Ph.D. He study English.

THE COURT: He studies English. Okay. Do you get the newspaper at your house?

TAIKO SARAGOSA: Yes.

THE COURT: And do you read the newspaper?

TAIKO SARAGOSA: Sometime.

THE COURT: Is that the *Omaha World–Herald?*

TAIKO SARAGOSA: Yes.

THE COURT: Mrs. Saragosa, I want to turn your attention now to a phone call that I think you had. Did Mrs. Norris, one of the lawyers, call you?

TAIKO SARAGOSA: Yes.

THE COURT: You have to answer out loud. I'm sorry.

TAIKO SARAGOSA: Yes, she did.

THE COURT: And did you talk with her on the telephone? .

TAIKO SARAGOSA: Yes.

THE COURT: Did you tell Mrs. Norris that you used a dictionary during the jury deliberations?

TAIKO SARAGOSA: Yes, I did.

THE COURT: And you told her that?

TAIKO SARAGOSA: I said could Mrs. Kasoba or somebody tell to her, so she asked me, and I tell her I did.

THE COURT: One of the other jurors told Mrs. Norris?

TAIKO SARAGOSA: Because she ask me.

THE COURT: And you said you did?

TAIKO SARAGOSA: Yes.

THE COURT: And did you bring that book with you today?

TAIKO SARAGOSA: Yes, I did.

THE COURT: Okay. I'm wondering if we could borrow this from you for a short period of time and return it to you. Would that be okay?

TAIKO SARAGOSA: Sure.

THE COURT: All right. We are going to call this book Exhibit number 1 to this proceeding, but we'll probably get you the original book, but we'll probably want to photocopy it. Okay. Mrs. Saragosa, could you tell me in your own words how you used the dictionary during the jury deliberations?

TAIKO SARAGOSA: I was reading. Then some vocabulary I don't understand, I put mark and I go—

THE COURT: Then you would look it up in the book?

TAIKO SARAGOSA: Yeah.

THE COURT: Do you remember the words? Well, let me back up. Mrs. Norris said in her affidavit that you looked up the words negligence and proximate cause. Did you look up those words?

TAIKO SARAGOSA: Negligence. I think I—sometime I understand that. I make sure. I check the dictionary. Some-

time I guess my own head, that's why I want to make sure, so that's why.

THE COURT: And was negligence one of those words?

TAIKO SARAGOSA: Yes.

THE COURT: You think so?

TAIKO SARAGOSA: Yes.

THE COURT: Do you remember any other words like proximate cause?

TAIKO SARAGOSA: I think one thing, some word I understand about sickness, so I check that the heart doctor, they say some other word they using.

THE COURT: Were you referring to the—perhaps the phrase heart attack?

TAIKO SARAGOSA: Heart attack, you know.

THE COURT: You think maybe you looked up heart attack in the book?

TAIKO SARAGOSA: No. I go words, you know, on the paper you gave me.

THE COURT: Yes, the instructions?

TAIKO SARAGOSA: Yeah, instruction. That's the part I look.

THE COURT: There were some words about being sick in the instructions that you looked up, is that it?

TAIKO SARAGOSA: I can't remember, you know, something, some part of this severe my—

THE COURT: Myocardial infarction?

TAIKO SARAGOSA: Yes. Right. That's it.

THE COURT: You looked up myocardial infarction?

TAIKO SARAGOSA: Yes.

THE COURT: Do you remember any other words?

TAIKO SARAGOSA: I can't remember. I have a habit, you know, sometime, if I'm not sure, I always look, go to dictionary, so—

THE COURT: It's possible that you looked up other words?

TAIKO SARAGOSA: Yes, I did.

THE COURT: Now, when you were using this dictionary that we have called Ex-hibit 1, did you ever tell any of the other jurors what you found in here?

TAIKO SARAGOSA: I was talking to Mrs. Simet maybe probably. Yeah.

THE COURT: You talked to Mrs.—Can you spell her name for me? Do you recall?

TAIKO SARAGOSA: I don't know. Mrs. Simet.

THE COURT: Mrs. Siever?

TAIKO SARAGOSA: Maybe.

THE COURT: I don't recall the name of the jurors either. Did you tell—did you just talk with her about general things, or did you talk to her about definitions from this book?

TAIKO SARAGOSA: I don't say anything about definition.

THE COURT: You did not say anything about the definitions?

TAIKO SARAGOSA: No. No.

THE COURT: Now, Mrs. Saragosa, did you tell Mrs. Norris that you did not understand language that was contained in the instructions by the Court?

TAIKO SARAGOSA: I don't say that.

THE COURT: You didn't say that?

TAIKO SARAGOSA: No.

THE COURT: Do you think you did understand the instructions?

TAIKO SARAGOSA: Yes. I tell her we have problem sometime with true or not true, yes or no, and before I see your instruction, I go on my feeling to, you know, and after I did this instruction—instruction say we have to follow instruction, that's why I follow instructions. That's come out right. That's what I say.

THE COURT: Now, Mrs. Saragosa, tell me about yes or no, true or false. My understanding is that sometimes you have trouble with the way English uses yes or no or true or false, is that right?

TAIKO SARAGOSA: Right.

THE COURT: Mrs. Saragosa, I'm asking to ask Mary Buckley, who I think you know. Do you know Mary?

TAIKO SARAGOSA: Yes.

THE COURT: She used to teach English as a second language too. She's going to give me an example and you an example of what she thinks a question you would have difficulty with, if you were to think of it in Japanese, and then you and I will talk about it in a little bit. Ms. Buckley.

MARY BUCKLEY: You didn't go to the store, did you?

TAIKO SARAGOSA: No, I don't.

THE COURT: Your answer is no, I don't. Okay. That's the kind of question you would have some trouble with, is that right?

TAIKO SARAGOSA: That's right.

THE COURT: And so as I understand it, you have to think real hard about the English words and sort of rephrase the question. Is that how you deal with questions like that?

TAIKO SARAGOSA: You tell me again.

THE COURT: When you have a question like Mary just asked?

TAIKO SARAGOSA: Yes.

THE COURT: And it's asked you in English, what do you do in order to be able to answer it?

TAIKO SARAGOSA: What I do?

THE COURT: What do you do?

TAIKO SARAGOSA: Do I go store, you said, didn't you?

THE COURT: Can you restate the question for us?

MARY BUCKLEY: You didn't go to the store, did you?

TAIKO SARAGOSA: No, I don't. I supposed to be go store?

THE COURT: Okay. And so you think about what the question means when you have a question like that, is that right?

TAIKO SARAGOSA: That's right.

THE COURT: When you hear a question like that, are you careful to listen to it real carefully in English?

TAIKO SARAGOSA: Sometime not, you know. Sometime I'm careful, but sometime I'm not.

THE COURT: In the courtroom, were you being careful?

TAIKO SARAGOSA: Yes, I was, yes.

THE COURT: Is that what you meant when you told Mrs. Norris that sometimes you had trouble with yes or no?

TAIKO SARAGOSA: No. I don't know. I mean, that's a different subject.

THE COURT: Well, tell me what subject is different.

TAIKO SARAGOSA: I look through your—

THE COURT: Instructions?

TAIKO SARAGOSA: —instruction before we discuss with other people.

THE COURT: Yes.

TAIKO SARAGOSA: You know? We did look at it. I said myself, true or untrue or no or yes, that's what I did wrong, you know, like some were Johnson, true or untrue, something like that.

THE COURT: Were you looking at the verdict form?

TAIKO SARAGOSA: I think so.

THE COURT: Do you have a copy of the verdict form?

MR. WOODKE: Yes.

THE COURT: Thank you, Mr. Woodke. I'm handing you a document that we are going to mark here, we'll call it Exhibit 2. Is this the document that you were talking about, the yes or no document?

TAIKO SARAGOSA: No.

THE COURT: No, that is not the document, so it wasn't the verdict form?

TAIKO SARAGOSA: I think you have right over here.

THE COURT: No, these are legal papers that you didn't see. Do you have the instructions? I'm going to hand you another document that we'll call Exhibit 3 which are the jury instructions. Was this the document?

TAIKO SARAGOSA: Yes, I think so. I think so.

THE COURT: Do you remember where you had the yes or no problems? Don't pay any attention to that highlighting.

That was just put in there by somebody else?

TAIKO SARAGOSA: This right here.

THE COURT: Just a minute. Pardon me? You had—you're pointing to—

TAIKO SARAGOSA: Some here.

THE COURT: You're pointing to instruction number seven?

TAIKO SARAGOSA: Probably, but I remember, you know, these answer.

THE COURT: Oh, I see.

TAIKO SARAGOSA: I did myself. I marked myself. That's what wrong, I did wrong that time. I mean, I used, you know, this is my the first time in a courtroom, so—

THE COURT: So you wrote down your answers, what you thought, on the instruction?

TAIKO SARAGOSA: Yeah.

THE COURT: For example, on instruction seven, if it said that Warford made the claimed representation of fact regarding his health, you would have written down on your copy of the instructions, yes or no?

TAIKO SARAGOSA: Right, like that.

THE COURT: And that was simply to help you understand the instructions, is that right?

TAIKO SARAGOSA: Um-hm, yeah.

THE COURT: So when you said you were having trouble with yes or no, you thought you had—you were supposed to write down yes or no on the instruction form itself, is that right?

TAIKO SARAGOSA: Yeah. Then true or not true, you know. That.

THE COURT: Would you write down by true or untrue, what you thought was right?

TAIKO SARAGOSA: Yes.

THE COURT: What you thought the evidence showed you, is that right?

TAIKO SARAGOSA: Yes, but that's what I do the first time, so, of course, you know, not sure, so I looked again, and I listen to other people, we discuss with the other people so it comes out, you know.

THE COURT: All right. So you might think one thing at one point, and you would listen to the other jurors and might change your mind. Is that kind of how it happened from time-to-time?

TAIKO SARAGOSA: Yes.

Transcript of Interrogation of Juror Saragosa at 8:14–22:19.

### 3.

Jackson–Life made a related request for court-certified interpreter at court's cost. (Filing 150). I granted the motion in part and denied it in part.[15]

A translator recommended by the Administrative Office of the United States Courts was engaged by the court. She provided a translation of the words Mrs. Saragosa could remember looking up in her dictionary. (Filing 163, Attachment.)

Specifically, the translator was asked to translate the word "infarction," as modified by the word "myocardial," on page 581 of Sanseido's New Concise English–Japanese Dictionary (Revised Edition). She was then requested to interpret the Japanese equivalent of those words. The result was that "myocardial infarction" translated in this context as "shinkin kosoku." These Japanese words mean "blockage of blood vessels and accompanying damage to heart muscle."

The translator was also asked to translate the word "negligence" on page 761 of Sanseido's New Concise English–Japanese Dictionary (Revised Edition). She was then requested to interpret the Japanese equivalent of that word. The result was that "negligence" translated in this context as "kashitsu." This word means "when one is obligated to pay attention, but fails to do so."

---

**15.** It was unclear from the motion precisely what Jackson–Life wanted me to do with the interpreter. The court lacked the funds to fly the translator/interpreter to Nebraska or otherwise engage her to give testimony. Therefore, I submitted the relevant pages of the dictionary to the translator/interpreter for her review, and she submitted a written translation and interpretation. The written translation and interpretation were supplied to counsel. (Filing 163).

4.

I strongly disagree with Jackson–Life's claim that Mrs. Saragosa was not competent to serve as a juror. It should be noted that no party issued a challenge for cause to Mrs. Saragosa's service as a juror. Mrs. Saragosa spoke in open court and her somewhat stilted speech should have alerted the parties, if they were legitimately concerned, that she might have difficulty with the English language. As one commentator has said, "[f]ailure to object at the time the jury is impaneled operates as a conclusive waiver if the basis of the objection is known or might have been known or discovered through the exercise of reasonable diligence, or if the party is otherwise chargeable with knowledge of the ground of the objection." R.S. Hunter, *Federal Trial Handbook 2d* § 19.2, at 251 (1984) (citing *Johnson v. Hill*, 274 F.2d 110 (8th Cir.1960).

More to the point, I simply have no doubt that Mrs. Saragosa was a competent juror who fully understood the proceedings. It is true that she has some difficulty expressing herself in the English language. It is also true that from time to time Mrs. Saragosa used a translation book when she wanted "to make sure." However, it is equally true that Mrs. Saragosa, an otherwise diligent juror, has used the English language as an important component of her everyday life in this country for about a quarter of a century.

Mrs. Saragosa is an American citizen who testified that she understood the court's instructions, contrary to the claims of attorney Norris. Furthermore, Mrs. Saragosa testified that she was careful to listen intently in the courtroom. My observations of Mrs. Saragosa during trial confirm that she appeared attentive to the proceedings.

Mrs. Saragosa indicated she had been married to her American-born husband since 1965, that her husband spoke only a "little bit" of Japanese, and that he taught English as a second language at Creighton University. In addition, Mrs. Saragosa testified that her 26–year–old son is enrolled in a Ph.D. program in English in Berkeley, California. She also testified that her family subscribes to the Omaha World–Herald newspaper, which she reads from time to time. Mrs. Saragosa testified that she has lived in the United States for more than twenty-five years. Finally, a reading of the transcript of the interrogation of Mrs. Saragosa reveals that she was able to answer the court's questions thoroughly, intelligently, and responsively.

Title 28 U.S.C. § 1865(b)(2) and (3) provides that an individual is generally qualified to serve as a juror unless, with other exceptions not pertinent here, (a) the prospective juror is "unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror-qualification form," or (b) the prospective juror is unable to speak the English language.

There is no evidence that Mrs. Saragosa was unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror-qualification form. Indeed, although the proceedings are not formally recorded, as a prospective juror, Mrs. Saragosa would have been oriented by a United States district judge, placed under oath, and asked whether she was able to read, write, and speak the English language. There was evidently no disqualifying response. Moreover, there is no evidence that a determination was made that Mrs. Saragosa was not a qualified prospective juror pursuant to 28 U.S.C. § 1865(a).

■ These facts, together with the others developed during *voir dire* and the posttrial interrogation of Mrs. Saragosa, require me to conclude that Mrs. Saragosa was competent to serve as a juror. The fact that a juror is more comfortable in one language than another does not mean the juror is incompetent. *See, e.g., United States v. Tormes–Ortiz*, 734 F.Supp. 573, 576–77 (D.P.R.1990) (holding that the possibility that jurors listened to all of the evidence, and the court's instructions on how to consider it, in English but later conduct-

ed their deliberations in Spanish was of no legal consequence).[16]

5.

■ The second prong of Jackson–Life's argument is that Mrs. Saragosa's use of a dictionary or translation book during the deliberative process improperly influenced her, and perhaps other jurors, by extraneous forces. It is true that Mrs. Saragosa remembered looking up the definitions of the words "negligence" and "myocardial infarction."

In determining the significance of Mrs. Saragosa's action, it must be remembered that "where ... the jury simply supplements the court's instructions of law with definitions culled from a dictionary, it remains within the province of the judge to determine whether this conduct distorted the jury's understanding of the law to the prejudice of the [party]." *United States v. Cheyenne*, 855 F.2d 566, 568 (8th Cir.1988) (holding that jury's unauthorized and improper use of pocket dictionary during deliberations to instruct itself on meaning of words in instruction defining elements of second-degree murder did not prejudice defendant). On the other hand, where the "jury considers factual evidence not developed at trial, the error is presumptively prejudicial." *Id.* But even where the error is presumptively prejudicial the error may be overlooked if it is harmless. 3 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 606[05], at 606–59 (footnotes omitted).

Mrs. Saragosa's effort to obtain a definition of the phrase "myocardial infarction" was not prejudicial for three reasons.

First, the phrase "myocardial infarction" appeared in the instruction setting forth the uncontroverted facts of this case. (Filing 119, Instruction 6, ¶ 8.) Thus, there was no factual dispute which could have been resolved by Mrs. Saragosa through reference to a dictionary.

Second, it was clear from her testimony in English that Mrs. Saragosa had a layperson's understanding of the term. She indicated she understood the term was "about sickness" and involved a "heart doctor," affirming that to her the words meant "heart attack." (Transcript of Interrogation of Juror Saragosa at 15:8–14.)

Third, the translator employed at defendant's request—to translate the meaning of the Japanese equivalent for "myocardial infarction" found in the English–Japanese dictionary used by Mrs. Saragosa—determined that the equivalent meant "blockage of blood vessels and accompanying damage to heart muscle." (Filing 163, Attachment.) Thus, the dictionary used by Mrs. Saragosa was accurate as a matter of fact. *See* W. Dornette, *Stedman's Medical Dictionary* at 704 (4th ed.1978).

In summary, the words "myocardial infarction" were not in dispute; Mrs. Saragosa had a layperson's understanding of the words in English; and the English–Japanese dictionary used by Mrs. Saragosa to confirm her understanding was factually accurate. As a consequence, I fail to see how Jackson–Life was in any way prejudiced by Mrs. Saragosa's effort to obtain a Japanese definition of the phrase "myocardial infarction."

■ I am equally unpersuaded that Jackson–Life was prejudiced as a result of Mrs. Saragosa's effort to obtain a definition of

---

**16.** In this connection, I note that Mrs. Saragosa explicitly denied attorney Norris's representation that Mrs. Saragosa said she did not understand the language of the court's instructions. (Transcript of Interrogation of Juror Saragosa at 17:5–10.) Mrs. Saragosa did tell Ms. Norris that she made a preliminary determination on the face of her copy of the court's instructions as to whether she believed certain facts were true or not, but later changed her mind during the give-and-take of jury deliberations. (Transcript of Interrogation of Juror Saragosa at 21:14–25; 22:1–18.) Mrs. Saragosa was obvious-

ly fully able to participate in the give-and-take of the jury's deliberations, which were conducted in English. The fact that Mrs. Saragosa approached her duties deliberately and meticulously and listened to the views of other jurors before reaching her decision is highly probative evidence that she was sufficiently proficient in the English language to qualify as a juror. I also note that there is no claim by any juror that Mrs. Saragosa was unable to participate fully in the give-and-take of deliberations other than Ms. Simet's observation that Mrs. Saragosa consulted a translation book from time to time.

the word "negligence." I come to this conclusion for three reasons as well.

First, the definition of negligence was straightforward in this case. Among other things, the jury was instructed that negligence was "the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances." (Filing 119, Instruction 14.) Mrs. Saragosa testified that she believed she understood the instructions. There is nothing about the relative complexity of the words used in this instruction which compels the conclusion that a person of Mrs. Saragosa's ability with English would be confused.

Second, the English–Japanese equivalent used by Mrs. Saragosa was, once again, accurate. The Japanese equivalent of the English word "negligence" means "when one is obligated to pay attention, but fails to do so." (Filing 163, Attachment.) This equivalent is generally consistent with instruction 14.

Third, even if the translation book confused Mrs. Saragosa with regard to the word "negligence," there would still be no prejudice to Jackson–Life. As previously indicated, I shall set aside the jury's verdict on the negligence theory of recovery because it is barred by the statute of limitations. As a consequence, the propriety of Mrs. Saragosa's use of a translation book to define the word "negligence" is moot.

Finally, I make two concluding observations. There is no evidence that Mrs. Saragosa displayed her book or revealed the contents of her book to other jurors. On another point, it is possible that Mrs. Saragosa consulted her book on words other than "myocardial infarction" and "negligence," but cannot now remember what words she examined. However, the fact that the translation book appears to have accurately defined the words I know Mrs. Saragosa looked up convinces me that her use of the book generally was not prejudicial.

### III. Motion for Attorney Fees

In due course, Johnson moved for attorney fees, (Filings 130 and 145), requesting a fee of $125,000 (Filing 145.) Jackson–Life asserts that no fee is due, but that if one is awarded it should be no more than $50,000. (Defendant's Brief in Resistance to Plaintiff's Application for Attorneys' Fees at 14.) I shall award attorney fees [17] of $95,000 to Johnson.

### A.

A brief summary of the relevant facts is in order. These facts are derived from the court file, which includes a summary of the basis for the fee claim (Filing 145, Exhibit A); supporting and opposing affidavits (Filing 145, Exhibit 1 (plaintiff's counsel Duffy) and Exhibit 2 (plaintiff's expert Meusey); Filing 159 (defendant's expert Dittrick); and Filing 160 (defendant's counsel Woodke).

The complaint in this case was filed in December of 1988, and the case was tried in September of 1992. It took approximately six days to try the case (including jury selection). Approximately 31 exhibits were received in evidence, and 18 witnesses were called to testify at trial. Each side had two lawyers at the counsel table throughout trial. Discovery in this case took place primarily in the states of Washington and Nebraska, although facts were developed in other states and in the Far East (Taiwan), and included, among other things, approximately 18 depositions. On the contract theory of recovery, Johnson will recover $250,000 in principal, plus prejudgment interest of $166,534.85 and postjudgment interest of 12 percent on $250,000. According to plaintiff's counsel, defendant's highest settlement offer was $25,000.

Counsel for Johnson represents that if billed at his firm's standard rate (using rates per lawyer ranging from $85.00 per hour to $120.00 per hour), assuming pay-

---

**17.** This includes all nontaxable costs which would customarily be awarded as a component of any attorney fee, but excludes $1,163.50 worth of costs which are the subject of a bill of costs presented to the clerk of court.

ment on a monthly or quarterly basis, the fee charged to Johnson would have been approximately $94,137.00, plus costs of $8,028.81,[18] or a total fee of $102,165.81. The total number of hours claimed is around 928. Plaintiff's counsel concedes that about 52 hours, totaling $5,237 in fees and $300.00 in expenses, are attributable to the negligence claim. Counsel for Johnson further represents that for a variety of reasons a fair fee would be $125,000.

Jackson–Life contends that Johnson is not entitled to an award of attorney fees, but also asserts that if an award is made it should not exceed $50,000. Jackson–Life does not dispute the fairness of the hourly rates of between $85.00 and $120.00 charged by counsel for Johnson.

### B.

■ As a threshold matter, it must be determined whether or not plaintiff is entitled to an award of attorney fees as a matter of law. It is not disputed that Neb.Rev.Stat. § 44–359 (Reissue 1988)[19] requires an award of attorney fees if Nebraska law applies. The question is whether Nebraska law applies.

Since this is a diversity case, "[a]bsent exceptional circumstances, then, it is settled that as to matters governed by state law under *Erie*, a federal court must follow the choice-of-law rules of the state in which it is sitting to determine which state's law to apply." 19 C. Wright *et al.*, Federal Practice and Procedure § 4506, at 73 (1982) (stating the rule of *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). On this precise issue, the United States Court of Appeals held that Nebraska would consider Neb.Rev. Stat. § 44–359 as procedural and thus the Nebraska attorney fee statute would apply even though the substantive law of another

state is otherwise applicable. *City of Carter Lake v. Aetna Casualty and Sur.*, 604 F.2d 1052, 1062 (8th Cir.1979) (holding that Nebraska law applied on attorney fee question, despite the fact that Iowa law applied on substantive question, where action brought by insured against insurer was filed in federal court sitting in Nebraska). Clearly, Nebraska law applies unless plaintiff has somehow waived the claim.

■ Second, Jackson–Life argues that Johnson waived the claim because it stipulated that Washington law applied. I disagree. The short answer to Jackson–Life's argument is that I did not understand the stipulation to pertain to anything other than the question of what substantive law was to be applied.

### C.

■ Jackson–Life further argues that Johnson is not entitled to an award of attorney fees because the fee contract in this case, (Filing 160, Exhibit A), assigned any attorney fee award to Johnson's lawyer. While the fee contract may raise certain ethical concerns,[20] it is not an assignment. Moreover, Neb.Rev.Stat. § 44–359 makes it clear the award belongs to plaintiff and not to counsel by providing that the court shall award "**the plaintiff** a reasonable sum ..." (emphasis added). Thus, any fee award will belong to plaintiff alone.

### D.

■ Nine factors are considered under Nebraska law when an attorney fee is sought under Neb.Rev.Stat. § 44–359 (Reissue 1988). *Craig v. Farmers Mut. Ins.*, 239 Neb. 271, 279–80, 476 N.W.2d 529, 535 (Neb.1991). Those nine factors are: (1) the amount involved; (2) the nature of the litigation; (3) the time and labor required;

---

18. Counsel notes that $1,163.50 of these costs are being considered by the clerk of court as taxable costs.

19. The statute provides in pertinent part that "in all cases when the beneficiary ... brings an action upon any type of insurance policy [with exceptions not pertinent] against any company ... doing business in this state, the court ... shall allow the plaintiff a reasonable sum as an

attorney's fee in addition to the amount of his or her recovery...."

20. Whether plaintiff's counsel can, or will endeavor to, enforce the fee contract is not an issue before me, and I do not decide the question. It would be well, however, for plaintiff's lawyers to carefully determine whether the fee contract may ethically be enforced as written.

(4) the novelty and difficulty of the questions raised and the skill required to properly conduct the case; (5) the responsibility assumed; (6) the care and diligence exhibited; (7) the results of the suit; (8) the character and standing of the attorney; and (9) the customary charges of the bar for similar services. *Id.* In arriving at a fee of $95,000, I have applied these nine factors as follows.[21]

### 1. Amount Involved

The principal amount involved in this case was $250,000. When prejudgment interest is added, the amount climbs to about $416,535. Clearly, the amount involved, whether viewed from the perspective of the face amount of the policy ($250,000) or from the perspective of the face amount of the policy plus prejudgment interest ($416,-535), is a significant amount of money which warranted a significant expenditure of time and effort.

### 2. Nature of Litigation

This case was a relatively straightforward contract action. In order to avoid judgment, Jackson–Life had to bear the burden of proof on its affirmative defense of misrepresentation. Since Washington law applied, this case was somewhat more difficult for the Nebraska practitioners. In any event, this case did not pose especially difficult or novel legal issues save for the last-minute addition of the negligence cause of action. Since the negligence cause of action was barred by the statute of limitations, it would not be appropriate to consider the novelty of that claim for purposes of determining a fair attorney fee. All in all, this suit was of average complexity in terms of legal issues for commercial litigation.

### 3. Time and Labor Required

The parties disagree significantly concerning the time and labor required to prosecute this case. Johnson's lawyers claim they spent about 928 hours on the case, and their expert suggests this time was reasonable. Jackson–Life claims, and its position is supported by its expert, that this case could have been completed in about 500 hours [22].

It has been my practice to treat the number of hours claimed by a lawyer in an affidavit as presumptively accurate in the sense of timekeeping. I have reviewed the claim of Johnson's lawyers and, while I observe the normal ambiguity associated with most billing statements, I see no compelling reason to deviate from my past practice. I do not doubt that the lawyers for Johnson actually spent the time they claim to have spent. However, this does not mean the hours spent were reasonable and customary. I make the following observations concerning whether the hours spent were reasonable and customary.

Plaintiff's lawyers took this case on a contingency fee basis and thus had an incentive to be prudent about the number of hours expended because they had no assurance they would be paid. As noted below, Johnson's lead attorney is an experienced lawyer who would not be expected to waste his firm's time given the contingency nature of the fee arrangement. I note that Jackson–Life's lawyers have not submitted an affidavit detailing the amount of time they spent on this case.[23] Therefore, I

---

21. The result would have been the same had I applied the factors set out in the well-known case of *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974).

22. I note with interest that the law firm which employs Jackson–Life's expert recently submitted an application in which it made a claim for attorney fees in an ERISA case involving about $66,000. In that case, the law firm requested a total fee of $53,863 based on 688 hours of work. *See Lutheran Medical Ctr. v. Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan,* No. CV89–0–715 (Application for Attorney Fees, January 12, 1993) (Filing 127). *Lu-*

*theran Medical Ctr.* involved a 5 day bench trial before me, and was not as difficult as this case.

23. I also note, however, that Jackson–Life's lawyers spent about 50 hours, according to their affidavit, on the motion for fees and expenses regarding Johnson's failure to admit certain facts. (Filing 158, Exhibit I). Although substantively important, these matters were relatively insignificant as a portion of the total time that must have been involved in this case. Thus, there is not much doubt that the lawyers for Jackson–Life spent a good deal of time on this case as well.

have no basis to compare what Jackson–Life's lawyers now claim as reasonable against what they in fact charged their client. With one exception, I am satisfied that the 928 hours claimed are within acceptable norms.[24]

Johnson is not entitled to a fee for work done on the negligence claim because I have granted judgment in favor of Jackson–Life on that claim as a matter of law. Johnson's lawyers estimate that about 52 hours, or $5,237 worth of time and about $300 in expenses, were spent on the negligence claim. The relatively few hours expended on this claim are said to be a result of the late discovery of the claim. In any event, I have discounted the fee award by an amount I believe is fairly attributable to the negligence claim.

### 4. Novelty and Difficulty/Skill Required

This was an average piece of commercial litigation involving a significant amount of money. In this court, commercial litigation involving significant amounts of money requires above-average skill for successful prosecution before a jury because such a case tends to draw very able defense lawyers. Jackson–Life's lawyers were certainly very able. For example, lead counsel for Jackson–Life is an "av"-rated lawyer with 16 years' experience in this type of litigation. (Filing 160, ¶¶ 3 & 4.)

Most importantly, I think the skill required to prosecute this case was above average because, while the legal issues were not particularly novel or complex, at least one factual component of plaintiff's claim posed a difficult practical hurdle. The "key man" whose death precipitated this dispute had dealt with Johnson (his employer) and its suppliers in a dishonest fashion in certain unrelated business matters. Thus, regardless of the burden of proof, Johnson had the practical burden of persuading the jury that notwithstanding the dishonesty of the "key man" in other circumstances, similar dishonesty was not present in this case regarding the "key

man's" statements about his health history. The fact that Jackson–Life offered no more than $25,000 to settle this case attests to the difficulty this issue posed for plaintiff's counsel and the skill that was necessary to effectively deal with the problem.

### 5. Responsibility Assumed

Plaintiff's counsel assumed normal responsibility in this case. Johnson was a relatively small corporation with a fairly sophisticated president. There was nothing unusual about the responsibility assumed by plaintiff's counsel in this case.

### 6. Care and Diligence

The care and diligence exhibited by counsel for Johnson was of workman-like caliber.

### 7. Results of the Suit

Plaintiff prevailed, and given the very real problem of the "key man" and his prior "bad acts," the result was an especially good one.

### 8. Character and Standing of the Attorney

As noted by the defense, plaintiff's counsel "are fine lawyers." (Defendant's Brief in Resistance to Plaintiff's Application for Attorneys' Fees at 12.) Lead counsel for the plaintiff is an "av"-rated lawyer who has been admitted to practice in this court since 1966. (Filing 145, Exhibit 1, ¶¶ 3 & 4.)

### 9. Customary Charges of the Bar for Similar Services

Both parties cite various cases as examples of the customary charges of the bar for similar services. Most of the time, however, the parties have either cited cases that are not similar (such as criminal cases) or cited cases in other courts without providing enough information about those cases to enable me to make a fair assessment as to whether the cases are similar.

I know that the rates used by plaintiff's counsel to compute their "standard" fee ($85.00 to $120.00) were reasonable, that the number of hours billed was not out of

---

**24.** This does not mean I agree that every hour billed was necessary and customary. This finding means that when the total number of hours is considered in relationship to the nine factors set out by the Nebraska Supreme Court, the total number of hours billed is within a range that a reasonably prudent person would find acceptable in the relevant market.

line, and that, as defendant's expert conceded, "the present action was taken on a 40% contingency basis, which, the Affiant believes may well be reasonable in view of the difficult burden assumed by the Plaintiff in such case." (Filing 159, ¶ 8.) The "standard" fee would have been $94,137.00, plus costs of $8,028.81, or a total fee of $102,165.81. A 40–percent contingency fee,[25] calculated on $250,000, would result in a fee of $100,000.

With regard to plaintiff's argument that this case should be viewed as a "major matter," with billing rates of up to $150.00 per hour, resulting in a fee 20–25 percent above counsel's "standard" fee, counsel has not provided me with enough information about how that fee is normally calculated to determine the validity of the "major-matter" method of billing as compared to the market. To the extent that the "major-matter" method of billing is intended to recoup the time value of money lost in contingency fee cases, suffice it to say that I considered that factor when setting the fee in this case.

In summary, I am of the view that the bar would have charged in the neighborhood of $100,000 for a case of this kind. Thus, the fee of $95,000 that I award is fair and reasonable.

IV. Motion for Expenses and Sanctions

I shall next address Jackson–Life's renewal of its motion for award of expenses on failure to admit and request for sanctions (Filing 158). The defense motion, made pursuant to Federal Rules of Civil Procedure 36(a) and 37(c), renews the motion made on January 29, 1991, (Filing 60), which, although he found Jackson–Life's arguments appealing, United States Magistrate Judge Richard C. Peck denied without prejudice to renewal after trial (Filing 74). I, too, find Jackson–Life's arguments appealing, and I will grant the motion in part and deny [26] it in part.

A.

Before suit was filed, Johnson or a lawyer for Johnson (other than the lawyers engaged in this case) knew that: (a) Warford (the "key man") had died in Taiwan on August 13, 1986, of acute myocardial infarction (Plaintiff's Trial Exhibit 2); (b) at the time of his death, Warford was apparently carrying a prescription for nitroglycerine tablets issued by Dr. Frerichs of Beatrice, Nebraska (Defendant's Trial Exhibit 111); (c) Johnson had a copy, assumed to be genuine, of the records of Lutheran Hospital in Beatrice, Nebraska, regarding Warford's admission as a patient on April 1, 1978 (*id.*); (d) Johnson had a copy, assumed to be genuine, of Warford's prescription history from Bowen Rexall Drug of Wymore, Nebraska (*id.*); and (e) after reviewing various documents and conferring with Warford's Nebraska doctor, Johnson had not denied that Warford experienced heart problems which were not disclosed in the insurance application. (Defendant's Trial Exhibit 112.)

On March 23, 1989, Jackson–Life served requests for admission, (Filing 158, Exhibit A), which, read fairly, would have required Johnson to admit that Warford suffered a myocardial infarction in 1978 which was not disclosed on the relevant life insurance

---

**25.** Jackson–Life argues that "a contingency fee agreement has no relationship to the determination of a reasonable fee under [Neb.Rev.Stat.] § 44–359." (Defendant's Brief in Resistance to Plaintiff's Application for Attorneys' Fees at 8.) While it is true that the Nebraska Supreme Court has cautioned against allowing a contingency fee arrangement to govern the fee-setting process under § 44–359, I do not think the court meant to preclude any reference to contingency fees. For example, if a court is to seriously consider what the market would charge for a similar case, it would be foolish to disregard contingency fees if such fee arrangements exemplified the market. Indeed, as noted in the text, the defense expert thought the 40–percent contingency fee arrangement was "reasonable in view of the difficult burden assumed by the Plaintiff." Furthermore, in cases where there is in fact a contingency fee arrangement, it is necessary to consider the arrangement in order to take into account the time value of money lost to counsel by the lack of timely payment.

**26.** I deny the motion to the extent that it requests fees and expenses regarding Robert Felker, Jonathan Noll, and Andrew Branchesi for, among others, the reason that counsel does not explain in detail what federal rule of civil procedure Johnson violated relative to these individuals.

application, (Request 1), and that Warford had been treated for a heart attack (Request 6). Instead, Johnson answered the requests for admission by stating that it had made a reasonable inquiry, but the information known or readily obtainable by plaintiff was insufficient to enable it to admit or deny the requests.

On March 23, 1989, in those same requests for admission, Johnson was asked to admit, (Request 7), that Warford "filled" prescriptions for nitroglycerin on April 11, 1978, March 1, 1979, August 8, 1985, and April 30, 1986. (Filing 158, Exhibit A.) Johnson responded by stating that it had made a reasonable inquiry, but the information known or readily obtainable by plaintiff was insufficient to enable it to admit or deny the requests for admission. The prescription history, (Defendant's Trial Exhibit 104), which Johnson had before suit, (Defendant's Trial Exhibit 111), revealed that Bowen Rexall Drug had prescriptions for nitroglycerin for Warford which were dated (or the prescriptions used) on the dates set forth in the requests for admission.

On June 26, 1990, Jackson–Life served a supplemental request for admissions, (Filing 158, Exhibit C), which asked that Johnson admit foundation for the medical records of the hospital in Taiwan. A copy of the medical records was attached to the request. (Request 1.) Johnson was also asked to admit that, if called to testify, the doctors in Taiwan would testify that Warford died of an acute myocardial infarction. (Requests 2 and 3.) This supplemental request was accompanied by a letter from a Jackson–Life lawyer to Johnson's lawyer warning that if the requests were not admitted, Jackson–Life would engage in appropriate discovery and "aggressively" pursue fees and expenses as provided in the Federal Rules of Civil Procedure. (Filing 158, Exhibit B.)

As to the medical records, Johnson responded that no information was readily obtainable concerning the truth, completeness, or accuracy of the medical records or any translation,[27] and denied the request. Johnson also denied that, if called to testify, the doctors in Taiwan would testify that Warford died of an acute myocardial infarction. The defendant gave as a reason for this denial its inability to determine the qualifications of the doctors or their whereabouts.

On August 2, 1990, counsel for Jackson–Life wrote counsel for Johnson (Filing 158, Exhibit D). The letter addressed Johnson's failure to make admissions regarding Warford's past medical condition, the medical records in Taiwan, and the cause of death. Johnson's counsel was informed that defense counsel had spoken with both the Nebraska doctor and a Taiwanese doctor, that the doctor in Taiwan spoke English and could be reached by telephone, and that if Johnson persisted in its denials, depositions would be taken and costs and fees would be sought under the Federal Rules of Civil Procedure.

Johnson did not alter its position in response to the letter of August 2, 1990. Accordingly, the deposition of the principal doctor in Taiwan was taken by telephone on August 30, 1990, and apparently again on October 3, 1990. The Nebraska doctor was deposed on September 5, 1990.

On October 2, 1990, (Filing 158, Exhibit E), a lawyer for Jackson–Life advised in a letter to a lawyer for Johnson that: (a) Mr. Bowen of Bowen Rexall Drug had retired to Arizona; (b) Mr. Bowen would be able to verify Warford's prescription history and could be reached at a specific telephone number; (c) another copy of the prescription history was attached to the letter; and (d) since it would be expensive to take Mr. Bowen's deposition, it would be advisable to stipulate that if Bowen were called to testify he would state that "the enclosed records are the prescription records for ... Warford from the Bowen Rexall Drug for the dates indicated." Johnson would not admit foundation, and Mr. Bowen's deposition was taken on November 19, 1990.

Despite its previous denials, Johnson finally admitted in the pretrial conference

---

**27.** The medical records were maintained in both English and Chinese (Filing 62, Attachment). In other words, each entry had an English version and a Chinese version.

order dated December 20, 1990, (Filing 53, ¶ C 7, 8, and 9), that: (a) on or about August 13, 1986, Warford suffered an acute myocardial infarction and died at Yuan's Memorial Hospital in Taiwan; (b) Warford was diagnosed as having an inferior myocardial infarction in April, 1978; and (c) Warford spent ten days in Beatrice Lutheran Hospital in Nebraska for the myocardial infarction of April, 1978. There is no indication that Johnson ever endeavored to supplement or amend its previous denials prior to the concessions made in the pretrial conference order. These and other uncontroverted facts were read to the jury as uncontroverted facts. (Filing 119, Instruction 6.)

Johnson maintained its denial of Warford's prescription history at the pretrial conference, and objected to the prescription history and Warford's prescriptions on various grounds, including foundation. (Filing 55, Attachment, Objections to Defendant's Exhibits 104 and 105.)

Following the pretrial conference, Johnson continued to deny the facts regarding Warford's prescription history at Bowen Rexall Drug. On April 15, 1992, counsel for Jackson–Life sent counsel for Johnson a letter enclosing copies of the original prescriptions and asking the lawyer for Johnson to inform his opponent whether Johnson intended to withdraw the objections "so that we do not go to the expense of bringing the appropriate witnesses for those exhibits." (Filing 158, Exhibit G.) Counsel for Johnson did not respond.

Warford's prescription history, (Defendant's Exhibit 104), was received in evidence at trial. Jackson–Life also secured for trial the presence of the pharmacist who had purchased Bowen Rexall Drug. After the pharmacist testified, the original prescriptions were received in evidence without objection. (Defendant's Exhibit 105.)

### B.

Magistrate Judge Peck denied, (Filing 74), Jackson–Life's first motion for award of expenses on failure to admit and request for sanctions because he felt it would be difficult to make a pretrial determination as to whether Johnson had discharged its duty under Federal Rule of Civil Procedure 36(a) to "inform [itself] in a reasonable fashion" before denying the request. (Filing 74, quoting Advisory Committee Notes to the 1970 amendments to Fed.R.Civ.P. 36(a)).

Rule 36(a) requires a party answering a request for admission to ascertain the truth if the ability to do so is "reasonably within his power." 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2261, at 731–732 (1970). If a party fails to do so, and the adverse party later proves the truth of the matter, the court shall, pursuant to Fed.R.Civ.P. 37(c), enter an order that the party refusing to admit must pay the reasonable expenses incurred in making the proof, including attorney fees, unless one of four exceptions is established. The four exceptions are: (1) the request was held objectionable; (2) the admission was of no substantial importance; (3) the party denying the request had reasonable grounds for believing it might prevail on the matter; or (4) there was other good reason for the failure to admit. Fed.R.Civ.P. 37(c)(1)–(4).

I must now determine whether the following facts, all of which were proved at trial but not admitted by Johnson in response to requests for admission, justify imposition of an order for expenses, including attorney fees, pursuant to Federal Rules 36(a) and 37(c), to wit: (a) Warford died in Taiwan of an acute myocardial infarction; (b) Warford had suffered and been treated for a myocardial infarction in 1978; and (c) Warford "filled" prescriptions for nitroglycerin on April 11, 1978, March 1, 1979, August 8, 1985, and April 30, 1986.

#### 1.

Johnson's refusal to admit that Warford died in Taiwan of an acute myocardial infarction is inexplicable. Indeed, Johnson asserted this fact as true when it made the insurance claim. (Plaintiff's Trial Exhibit 2.) Thus, Johnson believed the truth of the matter since it asserted the fact as true.

Moreover, Johnson's refusal to admit that Warford had suffered and been treated for a myocardial infarction in 1978 was not justified. Johnson or one of its lawyers knew before suit that at the time of his death, Warford was apparently carrying a prescription for nitroglycerine tablets issued by Dr. Frerichs of Beatrice, Nebraska. (Defendant's Trial Exhibit 111.) Johnson or one of its lawyers had a copy, assumed to be genuine, of the records of Lutheran Hospital in Beatrice, Nebraska, regarding Warford's admission as a patient on April 1, 1978. (*Id.*) After reviewing various documents and conferring with Warford's Nebraska doctor, and prior to suit, Johnson did not deny that Warford had experienced heart problems which were not disclosed on the insurance application. (Defendant's Trial Exhibit 112.)

Johnson would neither admit nor deny these facts, stating only that it could not respond because the information known or readily obtainable was insufficient to enable it to respond. This type of response was not enough: "A general statement that he can neither admit nor deny, unaccompanied by reasons, will be held an insufficient response." 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2261, at 730. Before such a response may properly be given, the party making it "is required to set forth in detail the reasons why this is so." *Id.* Johnson failed to give specific reasons for its claimed inability to answer the requests for admission, and its refusals were therefore improper.

While the various requests for admission may have gone beyond these basic facts, Johnson should have qualified its denials and refusals as required by the plain words of Rule 36. Rule 36(a) states that "when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder." *See* 8 C.

Wright and A. Miller, *Federal Practice and Procedure* § 2260, at 728–729.

Moreover, it does not help that Johnson later admitted these facts in the pretrial conference order. By the time Johnson admitted these facts at the pretrial conference, Jackson–Life had expended its time and money to prove the facts and had done so after Johnson refused to admit the pertinent requests.[28] Rule 37(c) explicitly states that "if a party fails to admit ... and if the party requesting the admission **thereafter** proves ... the truth of the matter," with exceptions not pertinent here, fees and expenses shall be awarded (emphasis added).

Plainly, Rule 36 would be frustrated if a party could deny a request for admission without an appropriate basis, force another party to develop proof of the disputed fact, and later avoid fees and expenses by admitting the previously disputed fact in the pretrial conference order when the disputed fact should have been admitted earlier by way of a response to a request for admission. One of the primary purposes of the rule regarding requests for admission is "to relieve the parties of the cost of proving facts that will not be disputed at trial, the truth of which is known to the parties or can be ascertained by reasonable inquiry." 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2252, at 705. While a party may reduce its exposure for fees and expenses by making an appropriate concession in the pretrial order, such a concession will not provide the party with a safe harbor for the prior ill-advised denial where the adverse party has spent time and money to prove the fact denied.

Finally, I do not believe any of the four exceptions found in Rule 37(c)(1)–(4) are applicable here. The pertinent requests were not held objectionable. The admissions sought were of substantial importance. The party failing to admit did not have reasonable grounds to believe it "might prevail on the matter."[29] There

---

**28.** By making this admission at the pretrial conference, Johnson avoided sanctions pursuant to Federal Rule of Civil Procedure 11 for making controverted a fact known to be uncontroverted.

**29.** The fact that Johnson prevailed on the merits is not the important point. The rule speaks to whether a party had a reasonable belief that it would prevail "on the matter." The word "matter," as used in the exception found in Rule

was no other good reason to deny the requests. Accordingly, fees and expenses should be awarded for the failure to admit these facts in response to the requests.

2.

▮ I turn next to the request regarding whether Warford "filled" prescriptions for nitroglycerin on April 11, 1978, March 1, 1979, August 8, 1985, and April 30, 1986. For many of the reasons outlined above, Johnson's refusal to admit Warford's prescription history requires an award to Jackson–Life.

The prescription history, (Defendant's Trial Exhibit 104), which Johnson had before suit, (Defendant's Trial Exhibit 111), revealed that Bowen Rexall Drug had prescriptions for nitroglycerin for Warford which were either dated on the dates set forth in the request for admission or used on those dates. Before trial, Johnson's counsel assumed those records were genuine. (*Id.*) Johnson also knew before trial that at the time of his death Warford was apparently carrying a prescription for nitroglycerine tablets issued by Dr. Frerichs of Beatrice, Nebraska. (*Id.*)

On October 2, 1990, (Filing 158, Exhibit E) (a proposed stipulation accompanied by the suggestion that Bowen could be reached by calling a specific telephone number), and on April 15, 1992, (Filing 158, Exhibit G) (enclosing copies of the original prescriptions), counsel for Jackson–Life gave counsel for Johnson information that could have been used by counsel to address any concerns about the truthfulness of the matters sought to be admitted. Johnson ignored this information.

As noted previously, Rule 36(a) requires a party answering a request for admission to ascertain the truth if the ability to do so is "reasonably within his power." 8 C. Wright and A. Miller, *Federal Practice and Procedure* § 2261, at 731–732. Clearly, the ability to ascertain the truth was reasonably within Johnson's power. For example, Johnson had Warford's prescription history prior to trial, and Johnson's

counsel had stated prior to suit that he assumed the document was genuine; Johnson knew that at the time of his death Warford apparently had a prescription for nitroglycerine tablets issued by Dr. Frerichs of Beatrice, Nebraska; Johnson later got a telephone number for the retired pharmacist; and Johnson later got a copy of the original prescriptions. A phone call to Bowen or the man who purchased the drugstore from him would have confirmed the authenticity of the underlying documents.

If Johnson had any real concerns (such as whether there was more than one prescription, whether there were refills, whether there were telephone prescriptions, or whether Warford, as opposed to someone else, had "filled" the prescriptions), it could have qualified its answer. As noted previously, Rule 36(a) specifically provides that "when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder." At the very least, Johnson could have, and should have, admitted what the pharmacy's prescription history showed.

In summary, I do not believe any of the four exceptions found in Rule 37(c)(1)–(4) are applicable here. The pertinent request was not held objectionable. The admission sought was of substantial importance. The party failing to admit did not have reasonable grounds to believe it "might prevail on the matter." There was no other good reason to deny the request. Accordingly, fees and expenses should be awarded for Johnson's failure to admit the basic facts about Warford's prescription history in response to the request.

C.

Having concluded that Rules 36(a) and 37(c) require an award of fees and ex-

37(c)(4), refers to the language found in the introduction to Rule 37(c) regarding the failure to admit "any matter as requested under Rule

36." "Matter" thus refers to a fact which is the subject of a request for admission and not the merits.

penses, I award $7,742.20.[30] In making this award, I offer the following comments.

As noted previously, I deny the motion to the extent that it pertains to Robert Felker, Jonathan Noll, and Andrew Branchesi for, among others, the reason that counsel does not explain in detail what federal rule of civil procedure Johnson violated relative to these individuals. Thus, fees and expenses attributable to them have not been counted.

Furthermore, I have not allowed expert fees for Kate King in October of 1992. King was a translator. Jackson–Life has not explained why it needed King's services in October of 1992.

Generally speaking, Johnson does not challenge the factual accuracy of Jackson–Life's affidavit regarding fees and expenses (Filing 158, Exhibit I). However, Johnson does argue that because it agreed to stipulate to the testimony of Mr. Claybaugh, the man who bought the Bowen pharmacy, fees and expenses should not be awarded regarding that issue. I disagree. Suffice it to say that since the offer to stipulate came the night before Claybaugh was to testify, it came too late.

Finally, pursuant to the last sentence of Rule 36(a) the fee-shifting provisions of Rule 37(a)(4) apply regarding fees incurred in prosecuting this motion. To the extent that Jackson–Life did not prevail on this motion, I find that an award of fees and expenses against it would be unjust in that its motion was otherwise substantially justified. As to fees and expenses incurred by Jackson–Life in prosecuting this motion, I find that a fee of $2,000 is fair and reasonable,[31] and that sum is included in the total award.

IT IS ORDERED that:

(1) Defendant's motion and renewed motions for judgment as a matter of law (Filings 103, 104, and 131) are granted in part and denied in part as follows:

    a. Judgment as a matter of law is granted in favor of the defendant and against the plaintiff on plaintiff's negligence theory of recovery, and the judgment (Filing 128) is nullified as to the negligence theory of recovery, but the remainder of the judgment shall stand;

    b. The motions are otherwise denied;

(2) Defendant's motion for new trial (Filing 132) is denied;

(3) Plaintiff's motions for attorney fees (Filings 130 and 145) are granted and the plaintiff (not plaintiff's counsel) is awarded an attorney fee of $95,000 to be paid by defendant; to the extent necessary, the award shall be considered part of the judgment (Filing 128);

(4) Defendant's renewal of motion for award of expenses on failure to admit and request for sanctions (Filing 158) is granted in part and denied in part as follows:

    a. Pursuant to Federal Rules of Civil Procedure 36(a) and 37(c), plaintiff and its counsel shall pay fees and expenses to defendant in the total sum of $7,742.20;

    b. The motion is otherwise denied.

---

**30.** This award is based upon an analysis of the affidavit attached to Filing 158, (Exhibit I), and the determination that fees under Rule 37(a)(4) should be awarded for prosecuting this motion.

**31.** As required by the rule, I do not find that Johnson's opposition was substantially justified. Nor do I find that other circumstances make an award unjust. For example, I was singularly

unimpressed by Johnson's assertion that one of Jackson–Life's lawyers "took up a personal vendetta against plaintiff's counsel." (Supplement to Plaintiff's Brief in Response to Defendant's Motion for Award of Expenses on Failure to Admit and Request for Sanctions at 1.) Nothing Johnson provided me supported such an assertion.