Sue E. Swoboda HATLEY, Plaintiff,

v.

The STORE KRAFT MANUFACTURING COMPANY, Defendant.

No. 4:CV93–3170.

United States District Court, D. Nebraska.

Aug. 3, 1994.

**1258**

Carole McMahon–Boies, Lincoln, NE, for plaintiff.

Paul D. Kratz, Omaha, NE, for defendant.

## MEMORANDUM OPINION, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND RELATED ORDER

KOPF, District Judge.

This matter is before me for issuance of findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), and resolution of related issues.

Sue E. Swoboda Hatley (Hatley) sued The Store Kraft Manufacturing Company (Store Kraft). She claimed to have suffered discrimination in the workplace because of her sex.

## I. BACKGROUND

The history of this case is important to an understanding of the resolution of this matter.

### A.

Hatley complained that she was subjected to a variety of unlawful employment practices during her employment at Store Kraft. Specifically, Hatley claimed that:

1. She was discriminated against because of her sex in that she was given difficult job assignments while the men received light work assignments;

2. She was sexually harassed by coworker Robert Geer, that Store Kraft knew or should have known of this harassment, and that Store Kraft failed to take proper remedial action;

3. Store Kraft retaliated against her when she complained about Geer's sexual

harassment in that she was given heavier work assignments while the men were given lighter work assignments and she was not assigned light-duty work when she hurt her back, while injured males were given light duty; and

4. She was forced to quit her employment with Store Kraft because the company made her working conditions intolerable because of her sex.

The incidents Hatley describes in her first three complaints allegedly took place before and after November 21, 1991. Hatley's fourth claim concerning constructive discharge arose on or about January 30, 1992 (the date she resigned), but involved, from her perspective, the conditions of her employment both before and after November 21, 1991.

The pretrial conference order in this case, entered May 26, 1994, couched Hatley's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1981 & Supp.1994), the Civil Rights Act of 1991, Rev.Stat. § 1977A, 42 U.S.C. § 1981a(a) (Supp.1994), as added by § 102, Pub.L. No. 102–166, 105 Stat. 1072, and the Nebraska Fair Employment Practice Act, Neb.Rev. Stat. §§ 48–1101 to –1125 (Supp.1993). (Filing 40 ¶ (E).) The order did not, however, suggest that any claim for punitive damages was asserted.

### B.

This case was complicated from a procedural point of view because the conduct Hatley complained about took place both before and after November 21, 1991, the effective date of the Civil Rights Act of 1991. For the first time, the Civil Rights Act of 1991 gave Title VII plaintiffs who suffered intentional discrimination the right to a jury trial and compensatory and punitive damages, in addition to the remedies (essentially injunctive relief and backpay awards) that had existed previously. 42 U.S.C. § 1981a(a)(1) & (c) (Supp.1994).

In *Landgraf v. USI Film Prods.,* —— U.S. ——, ——–——, 114 S.Ct. 1483, 1505–08, 128 L.Ed.2d 229 (1994), the United States Supreme Court held that the right to a jury trial and compensatory and punitive damage was not available to Title VII plaintiffs if the action arose prior to the effective date of the Act. Since this case involved *both* pre-act and post-act conduct, it was necessary to bifurcate consideration of these issues in order to be faithful to *Landgraf.*

I found that Hatley was entitled to a jury trial on the question of whether or not she suffered damage as a result of conduct occurring after November 21, 1991. (Filing 46.) However, I also found that Hatley was not entitled to a jury trial or compensatory damages for conduct occurring prior to November 21, 1991. *(Id.)* [1]

On June 2, 1994, Hatley filed a motion to amend the pretrial conference order, (Filing 44), seeking to add a claim for punitive damages. On June 6, 1994, the day trial began, I advised Hatley's counsel that I would not force Store Kraft to trial that day without permitting the company to engage in discovery on Hatley's punitive-damage claim. Since Hatley had not previously made a punitive-damage claim, and the pretrial conference order did not provide for the assertion of one, I believed Store Kraft might be unfairly prejudiced by the late assertion of such a claim. I therefore refused to amend the order unless Store Kraft was given time to prepare to meet the claim. After consulting with Hatley, counsel elected to abandon the punitive-damage claim and proceed to trial.

I submitted all four of Hatley's claims to a jury, instructing the jurors that they could not return a verdict against Store Kraft for acts or omissions which took place prior to November 21, 1991, and that they could not award damages for injuries suffered by Hatley prior to November 21, 1991. (Filing 61 Instruction 5.) However, I permitted the jury to consider all evidence of any acts or omissions, regardless of the date of such acts or omissions, when evaluating Hatley's

---

1. At the same time, I struck the jury demand and claim for compensatory damages on Hatley's state-law claim. *(Id.)* I deferred Store Kraft's motion to strike Hatley's pendent state-law claim altogether. *(Id.)* Hatley has not briefed or argued her pendent state-law claim; for that reason, I now find and conclude that she has abandoned that claim.

claims under the Civil Rights Act of 1991. (*Id.*)[2]

The jury returned its verdict on June 9, 1994. (Filing 62.) The jury found in favor of Store Kraft on Hatley's sex-discrimination claim. On all other claims, however, the jury found in favor of Hatley and against Store Kraft, awarding Hatley $25,000 in lost wages and fringe-benefit damages to the date of the verdict, $100,000 in lost wages and fringe-benefit damages from the date of the verdict until Hatley's normal retirement date, and $100,000 for such things as emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonmonetary damages.

### C.

◼ Still remaining to be decided are Hatley's claims against Store Kraft regarding conduct which took place prior to November 21, 1991, the effective date of the Civil Rights Act of 1991. Before I address the merits of the claims which are before me for resolution, a threshold issue arises.

Hatley states that since "the plaintiff is no longer in the employ of the defendant, and has received relief for the post November 21 damage by way of the jury decision, we now ask that the Court assess attorney's fees, costs, and pre and post judgment interest." (Pl.'s Trial Br. at 10.) As her brief points out, there is very little this court can do for Hatley pursuant to Title VII regarding pre-act conduct even if I conclude that Title VII was violated.

Hatley is not entitled to punitive or compensatory damages for pre-act conduct. Moreover, Hatley was not fired or demoted during the relevant time frame, and she did not resign until after November 21, 1991. In addition, since Hatley is no longer a Store Kraft employee, it is doubtful that injunctive relief would be appropriate. *See, e.g., Sahs v. Amarillo Equity Investors, Inc.,* 702

2. It was my view that pre-act conduct was relevant to post-act conduct, although such pre-act conduct was not actionable under the Civil Rights Act of 1991.

3. It is possible to understand *Parton* as pertaining only to sexual-harassment situations and not to other Title VII actions. However, *Parton* cited

F.Supp. 256 (D.Colo.1988); *Valdez v. Church's Fried Chicken, Inc.,* 683 F.Supp. 596 (W.D.Tex.1988). *See also* 1 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 41A.81 at 8–268 n. 40 (1993). Thus, insofar as pre-act conduct is concerned, Hatley has suffered no loss of pay which can be compensated by a back-pay award. She does not seek reinstatement. Moreover, injunctive relief does not appear appropriate in light of the fact that Hatley is no longer employed by Store Kraft and there is thus no reasonable expectation that the conduct would recur. Furthermore, since the post-act conduct, and particularly the constructive-discharge issue, was submitted to a jury, and the jury awarded compensatory damages, Hatley is not entitled to "front pay" as a result of the pre-act conduct. One wonders, therefore, whether the court is confronted with a "live" case or controversy insofar as the pre-act conduct is concerned.

This issue was addressed in *Parton v. GTE North, Inc.,* 971 F.2d 150, 154 (8th Cir.1992). In *Parton,* the court held that "[i]t is the law of this Circuit, however, that nominal damages are appropriately awarded where a Title VII violation is proved even though no actual damages are shown" (holding that it was appropriate to award nominal damages on a sexual-harassment claim under Title VII even though the district court had found that the female employee's later discharge was not gender based).

As I read *Parton,* I must proceed to determine the merits of this case because even if Hatley is not entitled to any substantive relief for pre-act conduct, she is entitled to nominal damages under Title VII if she proves her case.[3] Moreover, if Hatley proves her case, *Parton* further holds that she may be entitled to attorney fees. *Id.* at 155–56.

*Dean v. Civiletti,* 670 F.2d 99, 101 (8th Cir.1982), *Parton,* 971 F.2d at 154, in support of its holding that "nominal damages are appropriately awarded where a Title VII violation is proved even though no actual damages are shown." As *Parton* explicitly recognized, *Civiletti* was a sex-discrimination case.

With the foregoing in mind, I turn to the merits of this case.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

As noted, three of Hatley's claims arise from so-called pre-act conduct. Hatley claims she was subjected to sexual harassment prior to November 21, 1991, when coworker Robert Geer harassed her. She also claims she was subjected to sexual discrimination prior to November 21, 1991, in that she was assigned heavy-labor jobs in the plant while a male coworker was allowed to perform a sit-down job involving wiring. Finally, Hatley claims she was subjected to unlawful retaliation prior to November 21, 1991, in that Store Kraft continued to assign her heavy-labor tasks and failed to provide her with the type of help normally available to an employee performing heavy labor within the plant after she complained about Geer's conduct. I shall address each of these allegations in turn.[4]

### A. Sexual–Harassment Claim

■ Following are my findings of fact and conclusions of law regarding Hatley's sexual-harassment claim.[5]

### Findings of Fact

1. Hatley was at all relevant times a resident of Beatrice, Gage County, Nebraska.

2. Store Kraft is a manufacturer of store fixtures located in Beatrice, Gage County, Nebraska.

3. Hatley was employed by Store Kraft from 1978 until February 14, 1992, having given notice of her resignation on or about January 30, 1992.

4. Hatley's last position with Store Kraft was that of a number two candy case and showcase fitter, earning $10.22 per hour.

5. At the time her case went to trial, Hatley was a 45–year–old white female. She is a person of relatively small physical stature.

6. The Store Kraft factory in Beatrice, Nebraska, comprises six square blocks consisting of a business office and a factory. (Stipulation; Court's Ex. A.)

7. The second floor of the Store Kraft factory contains the final-assembly department where Hatley worked. (*Id.*)

8. Store Kraft has approximately 400 employees at its plant in Beatrice, Nebraska, approximately 275 of whom are production employees. (*Id.*) Store Kraft makes display cases for use by merchants.

9. Trial evidence revealed that Hatley was one of 26 employees, and the only female, working in the final-assembly department.

10. Hatley was a good employee; according to her employee evaluation on May 31, 1991, she received an overall "positive" evaluation and was described as a "willing and cooperative worker who is a pacesetter." (Ex. 2, Employee Evaluation of 5/31/91, at 2.)

11. It is undisputed that beginning in 1986 or early 1987, after her divorce, Hatley was subjected to unwelcome and abusive treatment by Robert Geer, a male coworker.[6]

12. Geer called Hatley his "little Susie," sang "O Susie–Q" to her, made disgusting sounds with his mouth when he was around her, and "moaned" her name; Hatley perceived all of this conduct to be sexually suggestive.[7]

---

4. It is important to recognize that nothing I find or conclude regarding Hatley's pre-act claims is intended to contradict or detract from the jury verdict regarding the post-act claims. Different facts are involved regarding the pre-act and post-act claims. For example, Hatley complained that she was harassed after November 21, 1991, by the same person who had harassed her earlier.

5. Any finding of fact more properly construed as a conclusion of law shall be so construed. Conversely, any conclusion of law more properly construed as a finding of fact shall be so construed.

6. In fact, while disputing that Geer sexually harassed Hatley, Store Kraft admitted, "There is certainly no question that Bob Geer was, in fact, bothering the Plaintiff." (Def.'s Post–Trial Br. at 12.)

7. Whether Hatley was correct in her perception is not critical. The important point is that this conduct was directed at Hatley because she was a woman (the only woman in final assembly).

13. Hatley testified, and it is not disputed, that she told Geer to stop, but he continued treating her in this fashion.

14. Although Hatley testified that she complained to her supervisor about Geer's harassment in 1987 and 1988, there is no record of such a complaint during that period of time, although a number of other employees, such as Walt Plegge, observed the continuing harassment and believed that Hatley had at least mentioned it to her supervisor.

15. In any event, Hatley testified, and I concluded her testimony was credible, that Geer continued to plague her.

16. The evidence reveals that Hatley made a specific complaint to her supervisor, Dennis Lee Parrott, on September 6, 1990. (Ex. 3.)

17. Parrott recorded Hatley's complaint in his own handwriting under the heading "nondiscrimination policy."

18. Parrott's statement of September 6, 1990, concerning Hatley's complaint, his findings, and his action can fairly be summarized as follows:

   a. Hatley registered a complaint with Parrott stating that Geer had been annoying her by singing the song "O Susie–Q" and making it difficult for her to work near him on the line. Hatley allegedly asked Geer to stop and Geer responded, "I thought you liked it."

   b. Parrott interviewed four male coworkers who corroborated Hatley's statement. In fact, one coworker stated, "Bob harassed her all the time."

   c. Parrott called Geer and Geer's union steward into his office and explained Hatley's complaint. Parrott also explained that under Store Kraft's policy harassment on the job did not require sexually explicit conduct; that Geer's singing could, and apparently was, creating an environment in which it was difficult for Hatley to do her job; and that if the behavior continued, the consequences included a potential

lawsuit and loss of employment. When advised that Geer would "desist" and that the matter was "resolved," Parrott responded, "I told him I would hold him to that."

19. Hatley testified that Geer's abuse continued after September 6, 1990, but there is no recorded evidence of another complaint by Hatley until August 16, 1991.

20. On August 16, 1991, Parrott received a complaint from two male coworkers about Geer's treatment of Hatley which he recorded under a document entitled "non-discrimination policy." (Ex. 4.) Exhibit 4 states:

   As I had heard from (2) people that [the names of the two men are set forth in the document] that they had overheard Bob Geer singing and making noises with his mouth to Sue and around her, I called Bob in and warned him again about making her work environment a hassle—he said he would watch it very close.

21. Hatley also testified, and it is not disputed, that she was required as part of her job to crawl in and around the products on the assembly line.

22. Hatley testified that Geer sometimes engaged in his harassment while her back was toward him, and this concerned her because she was fearful of hurting herself if he startled her.

23. The abuse continued, and on August 19, 1991, Parrott recorded that "Sue complained that Geer was calling her name when he walked by and was still harassing her." (Ex. 5.) Parrott "instructed her to give him a day to see if it would stop as a result of our talk on Friday—she said ok." (*Id.*)

24. The abuse continued, and on October 22, 1991, Hatley complained in writing that while she was at the "penciling machine running glass he was on line 2 [and] stood there and said, Oh Susie! Oh Susie! I have told him and asked [him] to stop but he won't." (Ex. 6.)

---

Harassment need not involve sexually suggestive conduct so long as it is directed at an individual because of gender. *See* 1 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 41A.34 (1993) (collecting cases, including *Hall v. Gus*

*Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988)). It is undisputed that Geer never directed this abuse to another man. In any event, I find that Hatley's perception was accurate.

25. On October 22, 1991, Parrott issued a written reprimand to Geer for violating company work rule No. 8 "regarding harassment because of conduct which has the purpose or effect of substantially interfering with an individual's work performance, or creating an intimidating, hostile or offensive work environment," which reprimand stipulated that the next violation of the rule would result in discharge. (Ex. 7.)

26. There is no doubt that Geer created a hostile work environment for Hatley because of her gender.

    a. Despite being asked to stop by Hatley and the supervisor, Geer repeatedly sang the song "O Susie-Q" to Hatley, the only female working in the area; he also called Hatley "his Susie," made disgusting sounds with his mouth, and moaned Hatley's name.

    b. On one occasion, a male coworker saw Geer make a sexually suggestive gesture with a dowel which was obviously directed at Hatley, although she did not observe Geer's lewd behavior.

    c. There was no evidence that this type of conduct was ever directed by Geer (or any other man) to another male.

27. There is little doubt that the sexually hostile atmosphere generated by Geer was pervasive and extended and affected a term or condition of Hatley's employment.

    a. For example, Parrott confirmed on September 6, 1990, that four of Hatley's male coworkers had corroborated her complaint. (Ex. 3.) Indeed, one of the men stated that "Bob harassed her all the time."

    b. That Geer's harassment was continuing and long-standing is evident from the fact that nearly one year later two of Hatley's male coworkers took it upon themselves to complain to Parrott "that they had overheard Bob Geer singing and making noises with his mouth to Sue and around her." (Ex. 4.)

    c. That Geer's harassment affected a term or condition of Hatley's employment

is evident from the many complaints lodged by or on behalf of Hatley, as well as Parrott's belated conclusion in the written reprimand of October, 1991, that Geer's conduct had "the purpose or effect of substantially interfering with an individual's work performance, or creating an intimidating, hostile or offensive work environment." (Ex. 7.)

28. It is undisputed that Hatley found Geer's conduct offensive. Indeed, in September, 1990, even Geer "admitted singing the song and stated that she had asked him politely to quit. . . ." (Ex. 3.)

29. As early as December 12, 1986, Store Kraft had a policy which prohibited one coworker from sexually harassing another when the "conduct has the purpose or effect of substantially interfering with an individual's work performance, or creating an intimidating, hostile or offensive work environment." (Ex. 1.) That policy specifically provided that any person subjected to such behavior "has a right to have such conduct *terminated immediately* and can make complaints to either his or her immediate supervisor or to the Personnel Manager." (Emphasis added.)

30. At least as early as February 21, 1991, Store Kraft's work rules required that a written reprimand be given for the first incident of threatening, intimidating, coercing or interfering with a fellow employee on company property, to be followed by discharge for the second offense. (Ex. 23, Work Rule 8(a), at 26.)

31. Giving Store Kraft the benefit of every doubt, if the company had followed its own policies, Geer should have received a written reprimand no later than August 16, 1991, and should have been fired no later than August 19, 1991.

32. The evidence clearly reflects that Hatley was subjected to a hostile work environment, and that Store Kraft knew it,[8] from at least September 6, 1990, through November 21, 1991.

---

8. Store Kraft admits that Geer "began singing a song, 'Suzie Q,' in 1986." (Def.'s Post–Trial Br. at 3.)

33. That Store Kraft did not terminate Geer on October 22, 1991, but decided merely to warn him again, is very persuasive evidence that Store Kraft never took proper remedial measures despite four well-documented complaints.

    a. Hatley was working on the "penciling machine running glass" when Geer began harassing her on this occasion. (Ex. 6.) There is no question that this type of work is potentially dangerous if the operator is startled.

    b. By October, 1991, Store Kraft had received three complaints spanning more than one year about Geer's mistreatment of Hatley. Despite the fact that Geer denied being abusive, all the employees who were interviewed corroborated Hatley's complaints. Store Kraft knew the abuse was so bad that two male employees had brought their own complaint about Geer's treatment of Hatley two months earlier.

    c. Despite this knowledge, on the fourth reported incident, when Hatley was operating a machine that could cause her serious personal injury if she were startled, Store Kraft did not terminate Geer when he began harassing Hatley once again.

34. That Hatley did not offer sexual harassment as a reason for quitting in January, 1992, is not surprising given the fact that Store Kraft did not follow its own policy.

35. That Hatley engaged in pranks, some of which had sexual overtones, with other coworkers does not prove Geer's approaches were "welcome" since it was obvious to everyone, including Parrott, that Hatley was being singled out as a woman and that she found Geer's conduct offensive.[9] In fact, the contrary inference can be drawn, i.e., that Hatley was accepted as a well-liked coworker by her male counterparts other than Geer, who singled her out for harassment because she was a woman.

36. That Hatley did not complain to her union is not surprising since she was the only female on the final-assembly line. Moreover, Hatley testified that after union meetings "stag films" were often shown. Under these circumstances, Hatley seriously questioned, with good reason, whether the union would support her in an action involving another union member, Geer, who was male.

### Conclusions of Law

1. In order to prevail in a hostile-work-environment sexual-harassment action under Title VII, Hatley had to prove that:

    a. She belonged to a protected group;

    b. She was subjected to unwelcome sexual harassment;

    c. The harassment was based on sex;

    d. The harassment affected a "term, condition or privilege" of employment; and

    e. The employer knew or should have known of the harassment and failed to take proper remedial action.

*Staton v. Maries County,* 868 F.2d 996, 998 (8th Cir.1989); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988).

2. Hatley has proved each of the five elements of her Title VII hostile-work-environment action and is entitled to nominal damages of one dollar ($1.00).

### B. Sex–Discrimination Claim

    ■ I turn next to Hatley's claim of discrimination regarding work assignments.

### Findings of Fact

1. The findings of fact enumerated in part A above are incorporated herein.

2. Hatley complains she was discriminated against with regard to job assignments because one of her coworkers, Frank Legg, was assigned to do electrical subassembly work while she was given other, harder work.[10]

---

9. "[T]he relevant inquiry in this type of case would seem to be whether the *particular* conduct in question was welcome, not whether the plaintiff had a proclivity for lewd humor." 1 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 41A.33, at 8–177 (1993) (emphasis in original).

10. Hatley also claims she was not given light-duty work when she injured her back in December, 1991. This issue is not before me as it was presented to the jury for resolution.

3. Hatley began her employment with Store Kraft in 1978 as a number four assembler. In 1984 she was promoted to the position of number three assembler, and in 1988, to a number two assembler/candy case and showcase fitter.

4. Hatley worked in the final-assembly area.

5. A variety of functions are required for final assembly of a showcase; several subassembly areas are associated with the final-assembly area.

6. Historically, specific people have been assigned to the subassembly areas, while others were assigned to teams working on the final-assembly lines.

7. For as long as Hatley was employed by Store Kraft, the electrical wiring subassembly work was assigned to two individuals.

8. When Parrott became foreman of the final-assembly area, Duane Searcey and Dale Evers were performing the subassembly tasks.

9. When Searcey retired, Parrott assigned Frank Legg and Dale Evers to do most of the electrical wiring subassembly.

10. Legg became a number two assembler at the same time as Hatley, but he had prior experience doing electrical wiring because he had temporarily transferred into that position on a number of occasions.

11. It was Parrott's opinion that Legg and Evers were the workers most proficient at wiring.

12. The workers assigned to the final-assembly line functioned as a team, and the team members divided the duties among themselves and performed whatever functions were needed.

13. Sometime in 1989, Hatley and others started work on what were known as "Target" and "Lerners" showcase units which required that some of the workers crawl inside the display cases to perform their tasks.

14. The workers did not crawl into the display cases every day, only when the units were on the final-assembly line.

15. Although her male coworkers also crawled into them, Hatley often crawled into the units because of her small size.

16. One of Hatley's male coworkers also frequently crawled into the units because of his small size.

17. Hatley had difficulty lifting large pieces of glass due to her small size, and her male coworkers performed that task from time to time.

### Conclusions of Law

1. In order to decide the issue of sex discrimination, the court should follow the analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

2. Hatley must first establish a prima facie case by showing that she is in a protected class, that she was properly performing her job, and that she was assigned a more strenuous job than her male coworkers. If she makes a prima facie case, the burden of going forward then shifts to Store Kraft to demonstrate that there was a legitimate, nondiscriminatory reason for the company's actions. If Store Kraft can do so, Hatley must demonstrate that the company's legitimate, nondiscriminatory reason was in fact a pretext for discrimination.

3. Although Hatley has obviously established that she is a woman who was properly performing her job, I conclude that she has not made a prima facie case because, with the exception of the two male subassemblers, Hatley was not given more strenuous jobs than her male coworkers. Hatley was assigned to a team of workers who divided their tasks among themselves without direction from their supervisor. While Hatley and one of her small male coworkers crawled into the display cases, other male workers were performing heavy tasks, such as lifting large pieces of glass, which Hatley was not able to do efficiently.

4. Even if I assume that Hatley has made a prima facie case by comparing what she did with what Frank Legg did, Store Kraft has proffered a nondiscriminatory reason for assigning Legg the subassembly job which I do

not believe is pretextual, i.e., Legg had prior experience doing electrical subwiring, and Hatley was not proficient at it.

5. Finally, and most importantly, Hatley's assignment was not intentional sexual discrimination as evidenced by the fact that some of her male coworkers who worked on the assembly line also complained about the nonrotating nature of the subassembly job assignments. Their complaints establish to my satisfaction that while many of the employees did not think the job assignments were fair, the job-assignment process had nothing to do with invidious discrimination under Title VII.

### C. Retaliation Claim

■ Hatley complains that she was given more difficult work assignments in retaliation for her claims of sexual harassment against Robert Geer.[11]

### Findings of Fact

1. The facts outlined in Parts A and B above apply to Hatley's retaliation claim as well.

2. During the relevant time frame, there is no evidence that Hatley was assigned more difficult tasks because she complained about Robert Geer.

### Conclusions of Law

1. It is unlawful for an employer to discriminate against an employee because that employee has opposed an unlawful employment practice. 42 U.S.C. § 2000e–3(a) (1981).

2. In order to prove retaliation, Hatley had to prove that:

a. She engaged in protected opposition;

b. An adverse employment action was taken against her; and

c. There was a causal connection between her opposition and the adverse action.

*Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). *See also Robinson v. Monsanto Co.,* 758 F.2d 331, 335 n. 3 (8th Cir.1985).

3. During the relevant time frame, there is no evidence that Hatley's job duties or employment status changed in any way after she complained about Robert Geer. Accordingly, Hatley has failed to prove the second element of her retaliation claim.

### III. ATTORNEY FEES

■ After a finding that Hatley is entitled to nominal damages on her sexual-harassment claim, there is still the question of whether she is also entitled to attorney fees. In a Title VII case, reasonable attorney fees are appropriately awarded to the "prevailing party." 42 U.S.C. § 2000e–5(k) (Supp.1994). *Parton v. GTE North, Inc.,* 971 F.2d 150, 155 (8th Cir.1992).

Because of the unusual procedural posture of this case, i.e., conduct occurring both before and after the effective date of the Civil Rights Act of 1991, it might be supposed that Hatley is entitled to submit separate motions for attorney fees, with supporting material, regarding her success on both the pre- and post-act conduct. However, I have conferred with counsel for both parties in this case, and counsel for Hatley concedes that Hatley had a full and fair opportunity to present her claim for attorney fees when she filed her motion for attorney fees in response to the jury's verdict. (Filing 65.) Thus, as all parties agree, there is no reason to provide the parties with an additional opportunity to address the attorney-fees issue now that Hatley has been found to be entitled to a nominal damage award for the pre-act conduct.

With the foregoing in mind, it is therefore appropriate to consider Hatley's fee application. (Filing 65.) Hatley asks for attorney fees in the sum of $25,173.45.

Except for two minor points, Store Kraft does not dispute the amount of attorney fees claimed by Hatley. Store Kraft's response suggests that the billable hours claimed by Hatley should be reduced by 14 hours and that the applicable fees should be calculated at a rate of $100 to $125 per hour. Hatley's counsel claims the fees should be calculated

---

**11.** Hatley also complains that when she hurt her back in December, 1991, she was not given light-duty work, in comparison to the males, as retaliation for her complaints about Geer. This issue was presented to the jury and is not before me for consideration.

at a rate of $145 per hour on a total of 173.61 hours. (Filing 65.) I agree with Hatley.

### A.

This court customarily uses the twelve-factor test enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), when awarding fees. NELR 83.-14, at 786 n. 1 (West 1993). *See Lutheran Medical Ctr. v. Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan*, 814 F.Supp. 799, 804 (D.Neb.1993), *aff'd*, 25 F.3d 616 (8th Cir.1994); *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 812 F.Supp. 966, 983 n. 21 (D.Neb.1993), *aff'd in relevant part*, 19 F.3d 431 ((8th Cir.1994). This same twelve-factor test is also customarily used in Title VII cases. 3 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 58.21 (1994). Accordingly, I shall now consider the relevant factors outlined in *Johnson v. Georgia Highway Express, Inc.*

#### Time and Labor Required

Hatley's counsel states under oath that she spent 173.61 hours on this case. Generally speaking, I am satisfied that this amount of time was reasonable.

This case was filed on May 13, 1993, and tried in a four-day trial which began on June 6, 1994. Discovery included at least two sets of interrogatories and four depositions. Hatley called six witnesses to testify and offered 16 exhibits into evidence. Store Kraft called seven witnesses and offered three exhibits into evidence. The expenditure of approximately 174 hours is certainly reasonable under the circumstances, and, in fact, reflects efficient handling of the case.

Store Kraft asks me to disallow 14 billable hours. I am not persuaded to do so.

■ First, Store Kraft argues that several of these hourly entries are in error because the dates do not correspond with the precise dates of the actual events. Even if this is true, there is no reason to doubt that Hatley's counsel spent the time on this case that she claims to have spent despite the discrepancy in dates.

Second, Store Kraft argues that counsel's review of certain actions by the Nebraska Equal Opportunity Commission was unrelated to this case and therefore should not be allowed. I disagree. A review of these materials was required for thorough trial preparation.

■ Third, Store Kraft argues that travel time is not legal work and therefore should not be compensated. I disagree. It is my impression that in the relevant economic market lawyers customarily charge for travel time while taking depositions and the like. There is certainly no evidence to the contrary.

■ Finally, Store Kraft argues that Hatley's counsel is not entitled to compensation for time spent preparing the fee application. The time it takes to prepare a fee application is appropriately included in a claim for attorney fees, and the time claimed here (approximately four hours) is well within the acceptable range for the tedious and time-consuming task of preparing such applications. *See, e.g., Smith v. Casmer* (D.Neb. Mar. 27, 1991) (No. CV89–O–194) (approving claim for time charged for preparing fee application as it was less than 10 percent of the total amount approved by the court); *Communications Workers of Am. v. Illinois Bell Tel. Co.*, 553 F.Supp. 144, 147 (N.D.Ill.1982).

In short, I am satisfied that the hours claimed by Hatley's counsel are fair and reasonable, that they were actually expended, and that they do not exceed the amount which competent counsel, similarly trained, would bill in the relevant economic market for a case such as this.

#### Novelty and Difficulty

This case was not novel, but it posed at least one difficult issue. Because the conduct in question occurred both before and after the effective date of the Civil Rights Act of 1991, Hatley's counsel had to prepare not only for a jury trial, but also for a simultaneous bench trial, being sensitive to the different issues presented by the pre-act and post-act conduct.

#### Skill Required

The skill required of counsel in this case was that of an experienced trial lawyer with a specialized background in labor-law issues.

**1268**

Hatley's counsel demonstrated that she possessed such skills.

### Preclusion of Other Employment

Aside from the hours expended, this case did not otherwise preclude counsel from taking other employment.

### Customary Fee

■ Cases such as this are customarily billed on an hourly basis, at least from a defense perspective. It is not clear how cases like this are billed from the perspective of the plaintiff's bar, although it is the court's impression that these lawyers frequently take such cases on a straight contingency-fee basis. Hatley's counsel indicates that in cases like this it is her practice to account for her hours in anticipation of seeking a fee award from the court if the client's cause is successful. Hatley asserts that a fair hourly rate is $145 per hour.[12]

Store Kraft argues that the hourly rate of $145 is too high. The ·company submitted the affidavit of an attorney, who I know is a competent employment-law practitioner, suggesting that he normally charges $90 to $135 an hour for the type of work involved in this case. (Filing 70.) This lawyer opines that it is "his impression that this amount is representative of the community standard." However, I believe the $145 hourly rate in this case is fair and reasonable and that it generally reflects what similarly situated competent counsel would charge in the relevant economic market for a case like this if the fee were expressed as a function of an hourly rate.

Establishing an appropriate hourly rate is not easy. Depending on the experience of the individual attorneys involved, commercial litigation in this court normally generates fees ranging from $90 to $150 per hour. *Lutheran Medical Ctr. v. Contractors, La-*

*borers, Teamsters & Engineers Health & Welfare Plan,* 814 F.Supp. 799, 805 (D.Neb. 1993), *aff'd,* 25 F.3d 616 (8th Cir.1994). Prisoner civil-rights cases generate court-approved fees ranging from $85 to $105 per hour. *Id.* Labor-law cases not infrequently generate awards of $160 to $170 per hour. *See, e.g., Meredith v. Gunatit Inc.* (D.Neb. 1993) (No. CV90–O–126) (Fair Labor Standards Act); *Stokes v. City of Omaha* (D.Neb. 1993) (No. CV89–O–664) (Age Discrimination in Employment Act).

Under the circumstances, I am satisfied that the rate of $145 per hour is appropriate for the relevant economic market.[13]

### Fixed or Contingent Fee

According to the affidavit of her counsel, Hatley agreed to pay one-third of any settlement as attorney fees. Furthermore, Hatley agreed that if the case was successfully tried, she would pay one-third of any recovery as attorney fees, after receiving a credit for any attorney fees awarded by the court. It was the understanding of Hatley and her counsel that counsel would account for her hours and submit an application for attorney fees based upon an hourly rate.

The fee application in this case is thus substantially less than the amount of attorney fees Hatley agreed to pay if she was ultimately successful in collecting the entire amount awarded by this court and the jury. This application substantially benefits Store Kraft because the fee Hatley is asking Store Kraft to pay is significantly less than the amount she is required to pay her attorney.

### Time Limitations Imposed by the Client Or the Circumstances of the Case

I can conceive of no particular time limitations or unusual circumstances that imposed upon counsel in this case in any significant

**12.** Hatley's counsel suggests in her brief that she customarily charges $140 per hour "for representation in these sorts of cases." (Pl.'s Br.Supp.Application Att'ys Fees at 3.) Her fee application is calculated at the rate of $145 per hour. There is no explanation for this discrepancy in either the affidavit or the brief. In light of the fact that the result in this case was especially good, and the $145–per–hour rate is not otherwise unreasonable, I have used the effective rate claimed in Hatley's counsel's sworn affidavit.

**13.** The affidavit submitted by Store Kraft in support of its position was authored by a lawyer who resides in Omaha, Nebraska. Store Kraft's counsel resides in Omaha as well. For purposes of this case, I am entirely satisfied that Omaha, Nebraska, and Lincoln, Nebraska, comprise one relevant economic market.

way. While counsel suggests that this case was progressed rather quickly, I do not believe that resulted in an unusual burden upon counsel.

### Amount Involved and Results Obtained

I agree with Hatley's counsel that the jury verdict of $225,000 was an especially good result, and that such an amount is a fair reflection of the amount actually involved in this case. To the jury, Hatley prevailed on all but one of her theories of recovery. Indeed, the jury awarded Hatley virtually everything she asked for.

### Experience, Reputation, and Ability of Attorney

Hatley's counsel is an experienced lawyer who has been admitted to the bar for approximately 12 years. She specializes in employment-discrimination law and handles approximately 20 employment-related cases per year. She has tried at least six employment cases to the United States District Court for the District of Nebraska, and each case has, at a minimum, involved an award of back pay. (Filing 65.)

Hatley's counsel also has substantial experience with employment cases before the United States Court of Appeals. *See, e.g., Williams v. KETV Television, Inc.,* 26 F.3d 1439 (8th Cir.1994); *Morrison v. FirsTier Bank,* 26 F.3d 65 (8th Cir.1994); *Rademaker v. State of Neb.,* 906 F.2d 1309 (8th Cir.1990); *Carney v. Martin Luther Home, Inc.,* 824 F.2d 643 (8th Cir.1987).

All in all, Hatley's counsel is an experienced attorney with a good reputation and well-above-average ability. She demonstrated superb trial skills when presenting Hatley's case to the jury.

### Undesirability of the Case

There was nothing particularly undesirable about this case that would cause counsel to suffer a hardship in the community.

### Nature and Length of Relationship with Client

There was nothing about the nature or length of the relationship with the client which would justify special mention.

### Awards in Similar Cases

It is extremely difficult to find comparable cases. Suffice it to say that cases tried to a jury which take about the same amount of time as this case and result in monetary awards roughly the same as that obtained by Hatley have in the past generated substantially greater fees than are sought in this case. *See, e.g., Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.,* 812 F.Supp. 966, 981–85 (D.Neb.1993), *aff'd in relevant part,* 19 F.3d 431 (8th Cir.1994) (awarding $95,000 in fees on principal recovery of $250,000 in a breach-of-contract case in a six-day jury trial).

As I observed in *Lutheran Medical Ctr. v. Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan,* 814 F.Supp. 799 (D.Neb.1993), *aff'd,* 25 F.3d 616 (8th Cir.1994), "roughly comparable work, requiring approximately the same amount of time, generates highly variable fees. This is undoubtedly true because it is unusual to award attorney fees due to the so-called American rule, which generally prohibits the awarding of attorney fees, and because there are peculiarities in each of the cases which make comparison difficult." *Id.* at 807.

Nevertheless, I am satisfied in this case, as I was satisfied in *Lutheran Medical Ctr.,* that, *generally speaking,* given current market conditions, attorney fee awards are not unreasonable if they do not exceed one-third of the amount recovered. Counsel's application in this case is much less than one-third the amount Hatley is entitled to recover on the jury's verdict. While this does not mean that the fee sought is reasonable, it is persuasive evidence.

### B.

In summary, after considering and balancing each factor, I shall grant the application for attorney fees and award Hatley attorney fees in the sum of $25,173.45, pursuant to 42 U.S.C. § 2000e–5(k) (Supp.1994).

### IV. UNRESOLVED ISSUES

There are two issues that must be resolved before judgment can be entered in this case.

First, there is the question of prejudgment interest. As part of the back-pay remedy, Title VII authorizes the award of prejudg-

ment interest against a private party, running from the discriminatory action until the date of the judgment. *See Equal Employment Opportunity Comm'n v. Rath Packing Co.,* 787 F.2d 318, 333 (8th Cir.), *cert. denied,* 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986); 2 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 55.37(b)(3), at 11–96.65 to –96.73 (1994). I shall give the parties an opportunity to advise me on the following questions:

1. Should prejudgment interest be awarded in this case?

2. If so, what rate of interest should apply?

3. If prejudgment interest is awarded, to what portion of the judgment should prejudgment interest apply, and upon what date should interest start?

Second, before judgment can be entered, the parties should advise the court whether the judgment in this case is subject to the limitations, determined as a function of the size of the employer, found in 42 U.S.C. § 1981a(b)(3) (Supp.1994), and, if so, how that provision should be applied to the facts of this case.

Consequently, I shall enter a briefing order on these issues. After receipt of the briefs, I shall resolve the issues, and judgment will be entered.

Accordingly,

IT IS ORDERED that:

(1) Within ten (10) days of the date of this opinion, the parties shall provide simultaneous briefs to the undersigned United States district judge addressing the issues outlined in part IV;

(2) The Clerk of the United States District Court for the District of Nebraska shall continue to withhold judgment until further order of this court.